No. 53,851

STATE OF KANSAS, *Appellant,* v. SHERMAN L. GALLOWAY, *Appellee.*

(652 P.2d 673)

Opinion filed October 22, 1982.

*Gregory L. Hammel,* assistant district attorney, argued the cause and *Robert T. Stephan,* attorney general and *Michael J. Malone,* district attorney, were with him on the brief for the appellant.

*Harry E. Warren,* temporary district attorney, was on the Supplemental Brief for appellant.

*Jeffrey O. Heeb,* of Lawrence, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

HERD, J.: This is an interlocutory appeal by the State from an order of the trial court suppressing evidence in a criminal action.

The facts out of which this action arose are complicated. On May 12, 1981, at approximately 12:30 a.m., Ms. G, a Kansas University (KU) graduate student, was attacked by a black male as she walked home. The man forced her into his car and drove her to Clinton Park in Lawrence where he raped her and sodomized her. He then left the park taking with him Ms. G's clothing, a set of keys to KU buildings issued to her, a backpack containing a

textbook with the victim's name in it, a swim cap, a coin purse and other items. Ms. G went to her apartment immediately after the incident and reported it to the police, who came and took her statement that night. The next day she aided the police in assembling a composite of her assailant and notified them of the items of personal property taken from her by the rapist.

On July 8, 1981, at approximately 10:20 p.m., Ms. R was jogging on the KU campus when she was attacked from behind by a black male wearing a sleeveless tank top shirt. He threatened Ms. R with a knife and dragged her down a hill into a bushy area where he raped and sodomized her. Ms. R managed to struggle free and run to a nearby street where she received a ride from a passing motorist. She notified the KU police, who went to the area and found a billfold containing the driver's license of Sherman L. Galloway. The next day officers of the KU police department (KUPD) submitted to Ms. R a photographic lineup of eight black males. From the photographs she identified Sherman L. Galloway.

During the afternoon of July 9, 1981, a warrant for the arrest of Sherman L. Galloway was issued charging him with the rape (K.S.A. 21-3502) and aggravated sodomy (K.S.A. 21-3506) of Ms. R. The same day Lt. Detective Vic Strnad of the KU police department obtained a search warrant for the residence of Sherman Galloway. The officers were authorized to seize "one (1) sleeveless tank top shirt appearing to be brown in color with horizontal stripes and one (1) knife with a curved blade approximately ¾ inch wide and approximately three to four inches long."

KU Detectives Strnad and Mike Riner and Lawrence police Detective Mike Hall executed the warrants during the evening of July 9, 1981. Detective Hall found a knife, which he seized, in the drawer of a nightstand. Next to the knife he observed a ring with KU keys on it. Detective Hall showed the keys to Detective Riner who also recognized them as KU keys. The officers then seized the keys. Other property taken in the search included drug paraphernalia and a portable food warmer marked "Property of Domino's Pizza. If found return to Domino's for reward."

On July 14, 1981, Detective Hall contacted Ms. G and showed her a ring of KU keys. She identified the keys as those taken from her by the person who sexually assaulted her on May 12. She later identified Galloway as her assailant from a photographic lineup.

On July 22, 1981, Detective Hall obtained a warrant authorizing another search of Galloway's residence, along with his automobile. Property listed on this search warrant included most of the things taken from Ms. G when she was attacked. During this search officers found and seized Ms. G's backpack, textbook, class notes and swim cap.

On July 24, 1981, an amended complaint was filed charging Galloway with rape and aggravated oral sodomy concerning Ms. R and kidnapping (K.S.A. 21-3420), aggravated robbery (K.S.A. 21-3427), rape and aggravated oral sodomy concerning Ms. G. The Ms. R charges were later severed from the Ms. G charges.

On September 25, 1981, Galloway filed a motion to suppress the KU keys seized from his residence on July 9, 1981. The trial court granted the motion and the State took an interlocutory appeal. The Court of Appeals, in an unpublished opinion, upheld the trial court. This court then granted the State's petition for review.

The sole issue in this interlocutory appeal concerns the propriety of the seizure of the KU keys during the July 9, 1981, search of the appellee's residence.

As a preliminary matter appellee contends the KU police officers were acting beyond the scope of their authority when they searched his residence, which was not located on KU property. Apparently the KUPD anticipated just such an argument. At the preliminary hearing Detective Riner testified he had been issued a card which certified that he was commissioned as a police officer of the City of Lawrence. The issue has no merit.

The essence of this search and seizure case pertains to the "plain view" exception to the 4th Amendment. Let us examine the development of the doctrine in detail. At the outset it should be borne in mind the 4th Amendment fundamentally guarantees protection against "unreasonable" searches and seizures. Thus "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357, 19 L.Ed.2d 576, 88 S.Ct. 507 (1967). These exceptions are "jealously and carefully drawn . . . ." *Jones v. United States,* 357 U.S. 493, 499, 2 L.Ed.2d 1514, 78 S.Ct. 1253 (1958). "[T]he burden is on those seeking the exemp-

tion to show the need for it." *United States v. Jeffers,* 342 U.S. 48, 51, 96 L.Ed. 59, 72 S.Ct. 93 (1951). A particular 4th Amendment violation may seem trivial and technical:

"[B]ut illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon." *Boyd v. United States,* 116 U.S. 616, 635, 29 L.Ed. 746, 6 S.Ct. 524 (1886).

The 4th Amendment also states "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Thus, absent one of those well-delineated exceptions, the seizure of items not particularly described in a search warrant is unconstitutional. An early Supreme Court case applied this rule strictly against the government. *Marron v. United States,* 275 U.S. 192, 72 L.Ed. 231, 48 S.Ct. 74 (1927), was concerned with the execution of a search warrant at the defendant's premises for intoxicating liquors and articles for their manufacture. Officers entered the premises and upon observing liquor being illegally served, they placed the defendant under arrest. A subsequent search yielded a large quantity of liquor along with bills and ledgers. The court held the seizure of these items could not be justified under the search warrant, stating:

"The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." 275 U.S. at 196.

The inconsistency created by *Marron* was obvious. When a search warrant was involved, nothing was left to the officer's discretion. When the officer happened to make an arrest, however, he was accorded the discretion to make the decision of what to seize.

The doubts resulting from *Marron* were at least partially eliminated by the court in *Coolidge v. New Hampshire,* 403 U.S. 443, 29 L.Ed.2d 564, 91 S.Ct. 2022, *reh. denied* 404 U.S. 874 (1971). The plurality opinion of Justice Stewart discussed the propriety

of seizing items while executing a search warrant naming other objects:

"It is well established that under certain circumstances the police may seize evidence in plain view without a warrant. But it is important to keep in mind that, in the vast majority of cases, *any* evidence seized by the police will be in plain view, at least at the moment of seizure. The problem with the 'plain view' doctrine has been to identify the circumstances in which plain view has legal significance rather than being simply the normal concomitant of any search, legal or illegal.

"An example of the applicability of the 'plain view' doctrine is the situation in which the police have a warrant to search a given area for specified objects, and in the course of the search come across some other article of incriminating character.

. . . . .

"What the 'plain view' cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused. The doctrine serves to supplement the prior justification — whether it be a warrant for another object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for being present unconnected with a search directed against the accused — and permits the warrantless seizure. Of course, the extension of the original justification is legitimate only where it is immediately apparent to the police that they have evidence before them; the 'plain view' doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges." 403 U.S. at 465-66.

*Coolidge,* then, set out three basic requirements which must be met before the plain view exception to the 4th Amendment is applicable: 1) The initial intrusion which afforded authorities the plain view must be lawful; 2) the discovery of the evidence must be inadvertent; 3) the "incriminating character" of the article must be "immediately apparent" to searching authorities.

The *Coolidge* court went on to explore the basis upon which the doctrine rests:

"The rationale for the 'plain view' exception is evident if we keep in mind the two distinct constitutional protections served by the warrant requirement. First, the magistrate's scrutiny is intended to eliminate altogether searches not based on probable cause. The premise here is that *any* intrusion in the way of search or seizure is an evil, so that no intrusion at all is justified without a careful prior determination of necessity. [Citations omitted.] The second, distinct objective is that those searches deemed necessary should be as limited as possible. Here, the specific evil is the 'general warrant' abhorred by the colonists, and the problem is not that of intrusion *per se,* but of a general, exploratory rummaging in a person's belongings.

. . . . .

"The limits on the doctrine are implicit in the statement of its rationale. The first of these is that plain view *alone* is never enough to justify the warrantless seizure of evidence. This is simply a corollary of the familiar principle discussed

above, that no amount of probable cause can justify a warrantless search or seizure absent 'exigent circumstances.' Incontrovertible testimony of the senses that an incriminating object is on premises belonging to a criminal suspect may establish the fullest possible measure of probable cause. But even where the object is contraband, this Court has repeatedly stated and enforced the basic rule that the police may not enter and make a warrantless seizure." 403 U.S. at 467-68.

After *Coolidge* came *United States v. Ross,* 527 F.2d 984 (4th Cir. 1975), *cert denied* 424 U.S. 945 (1976). There police obtained a search warrant listing a sawed-off shotgun for seizure. In executing the warrant two .38 caliber handguns were found concealed in a bed. The shotgun was not found. Ross explained his possession of the handguns by claiming them as security for loans he had made to the owners. The handguns were seized as they were suspected of being stolen. They were identified by the Treasury Department two days later as stolen. Ross was prosecuted for possession of a firearm by a convicted felon even though the police did not know of Ross's prior conviction when the handguns were seized. The Court of Appeals upheld the guilty verdict stating:

"Admittedly the guns were not named in the warrant, but the search which led to them was clearly legal. . . . The final question, then, is whether the guns were 'incriminating.'

. . . .

"For an object to be 'incriminating' for constitutional purposes, the seizing authority need only have reasonable or probable cause to believe that the object is evidence of a crime. [Citations omitted.]

. . . .

"[N]o more, it must be emphasized, is required of the officers' judgment than that it be reasonable on the appearances to them." 527 F.2d at 985-86.

Recently in *Petition of Becker,* 515 F. Supp. 1193, 1197 (D. Kan. 1981), the federal district court in Kansas expressly relied on the language from *Ross* in upholding the warrantless seizure of numerous pieces of art.

The Kansas cases on plain view are somewhat confusing. First, we have cases relying on but providing little discussion of the plain view exception. These cases do not involve the seizure of articles other than those listed on a search warrant. Instead, the officers were lawfully on the premises for some other reason, such as search incident to arrest, consent, lawful investigation, etc. See, *e.g., State v. Shaffer,* 223 Kan. 244, 574 P.2d 205 (1977); *State v. Miller,* 222 Kan. 405, 565 P.2d 228 (1977); *State v. Boone,* 220 Kan. 758, 556 P.2d 864 (1976). Another category is cases

which also do not involve a search warrant but at least delineate the elements of the plain view doctrine. See, *e.g., State v. Goodman,* 3 Kan. App. 2d 619, 599 P.2d 327 (1979); *State v. Jones,* 2 Kan. App. 2d 38, 573 P.2d 1134 (1978). Finally, there are Kansas cases which deal specifically with the discovery and seizure of items not listed in a search warrant. While not specifically applying the test set out in *Coolidge,* these cases appear to employ a species of the plain view doctrine. Typical of them is *State v. Turner,* 210 Kan. 836, Syl. ¶¶ 1 and 2, 504 P.2d 168 (1972), where we stated:

"When an officer is proceeding lawfully in making a valid search for items listed in a search warrant and discovers property known to be stolen, but which is beyond the scope of the warrant and unrelated to the listed items, he may seize the same and such property, if otherwise unobjectionable, may be admitted in evidence for the prosecution of the theft thereof."

"The validity of a search is not affected by the seizure of property beyond the scope of a warrant if the officer at the time of the seizure has probable cause, as distinguished from mere suspicion, to believe the property to be stolen."

See also *State v. Howard,* 224 Kan. 208, 212, 579 P.2d 702 (1978); *State v. Hubbard,* 215 Kan. 42, 523 P.2d 387 (1974).

Appellant argues the plain view exception should be modified to permit police to seize evidence inadvertently found in the course of conducting a lawful search where the police can point to particularized, articulable facts and reasonable inferences drawn therefrom which lead them to believe the evidence is incriminating; in other words, upon mere suspicion. We reject this suggestion. The protections against dragnet searches and seizures afforded by the 4th Amendment are basic building blocks for a free society. Tyranny is sustained by fear. A citizenry insecure is a scared citizenry. Totalitarian governments make excellent use of the technique in sustaining themselves. Still, investigation of crime is a most difficult task. It requires courage, diligence, tenacity and dogged determination. It is also adversarial. The law requiring an impartial third party to examine the evidence for probable cause before searching or arresting, except in exigent circumstances, is a meritorious rule. We adhere to the admonition that exceptions should be carved out of it most cautiously.

From our examination of the cases, both federal and state, we conclude the plain view exception to the 4th Amendment of the United States Constitution and Section 15 of the Bills of Rights of

the Kansas Constitution is applicable only where it is shown:   1) The initial intrusion which afforded the authorities the plain view was lawful by virtue of a warrant (search or arrest), waiver or exigent circumstances; 2) the discovery of the evidence was inadvertent; and 3) the authorities immediately had reasonable or probable cause to believe the evidence observed in plain view was incriminating in nature.

We do not find the foregoing test inconsistent with *State v. Turner,* 210 Kan. 836; it is merely more fully set out due to distinguishable facts. In applying the test, appellee argues the language in *Coolidge* that "plain view *alone* is never enough to justify the warrantless seizure of evidence" requires "exigent circumstances" always be present before the plain view exception is applicable. The better view is that the "exigent circumstance" requirement applies only where the searching authority uses plain view as justification for the intrusion. For example, in *State v. Schur,* 217 Kan. 741, 538 P.2d 689 (1975), the court nullified the seizure of marijuana which the officer viewed from outside an apartment. In this case, the court said, plain view alone was not enough to justify the intrusion. Thus, in *Schur* exigent circumstances were required to make the seizure of marijuana valid. If, on the other hand, the officer had lawfully been in the apartment, exigent circumstances would have been unnecessary. See *State v. Lair,* 95 Wash. 2d 706, 630 P.2d 427 (1981).

The defendant in *Washington v. Chrisman,* 455 U.S. 1, 70 L.Ed.2d 778, 102 S.Ct. 812 (1982), made a similar argument. There a campus officer accompanied a student illegally carrying liquor back to his room to allow the student to produce identification. While standing at the threshold of the room the officer observed what he believed to be marijuana seeds and a pipe on a desk which prompted him to enter the room and conduct a closer examination. The defendant argued the officer lacked the necessary exigent circumstances to investigate the plain view. The court disagreed, holding the "intrusion" was proper. Since the defendant had been placed under lawful arrest, the court said, the officer had a right to remain "literally at [the arrestee's] elbow."

In the instant case the "intrusion" was lawful because the officers were executing a valid search warrant. Thus, although exigent circumstances may sometimes be required to support the plain view exception, in this case, as in *Chrisman,* they were not.

Let us now turn to the instant case and determine if it qualifies as a plain view exception to the 4th Amendment. Applying the three-pronged test set out earlier it is apparent the first two requirements pose no problem. The initial intrusion was lawful by warrant, and the discovery of the keys was not planned.

Application of the third factor, however, is more difficult. It rests on whether the "incriminating character" of the keys was "immediately apparent" to the officers who searched the Galloway residence. To make this determination the surrounding circumstances and officers' testimony should be considered in some detail.

Galloway was under arrest and accused of a violent crime. The officers were lawfully in his house to search for the crime weapon and some of his clothing. While searching they came upon a stolen pizza oven and the keys.

Detective Strnad testified that because of his employment at KU he recognized the keys as KU keys. He also testified he possessed knowledge of several nonforcible burglaries at KU, which could have occurred only by the use of keys. He also testified he knew Galloway was not a student or employee of KU.

Detective Hall was the officer who actually found the keys, along with the knife, in a nightstand drawer. Hall was also familiar with KU keys because he had had two wives who worked at KU and he also worked with KU detectives. Hall seized the keys and handed them to Detective Riner for his assessment of whether they were KU keys. Hall believed the keys to be contraband. He also testified Galloway's wife called while the three officers were in his house and from the call, which he took, he formed the impression she worked at Hallmark Cards.

Detective Riner testified that when Detective Hall asked him whether he thought the keys were university keys he replied in the affirmative and took them into his possession to later show Detective Strnad. Like his companions, Riner thought the keys were stolen. He knew KU keys frequently turned up missing and he had a general knowledge of nonforcible burglaries at the university.

Even though the State's witnesses were weak on cross-examination, from the totality of the circumstances of this case we have no hesitation in concluding the officers had reasonable cause to

believe the keys were contraband with incriminating characteristics. Thus the seizure was proper.

The order suppressing the admission of the keys into evidence is reversed. The appeal is sustained.

FROMME, J., not participating.