No. 74,668

STATE OF KANSAS, *Appellant,* v. ROGER KENT RENO, *Appellee.*

(918 P.2d 1235)

Opinion filed May 31, 1996.

*Sheryl A. Beagley,* county attorney, argued the cause, and *Carla J. Stovall,* attorney general, was with her on the briefs for appellant.

*Daryl D. Ahlquist,* of Hines, Ahlquist & Creitz, P.A., of Erie, argued the cause and was on the briefs for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This is an interlocutory appeal by the State pursuant to K.S.A. 22-3603 in two separate criminal actions from the orders of the district court suppressing evidence. The two cases were consolidated into one appeal. In case No. 93CR333CH, the district court suppressed evidence seized from Reno's residence in the execution of a search warrant. In case No. 93CR385CH, the district court suppressed evidence found on the ground near where

Reno was stopped by a police officer while walking on a public street. The appeal was transferred from the Court of Appeals by order of this court pursuant to K.S.A. 20-3018(c).

The relevant facts are not in dispute in either case.

Seizure of Contraband from Dwelling. In August 1993, an execution was issued in the District Court of Douglas County, Kansas, which recited that Betsy Reno had obtained a judgment against Roger Reno for more than $9,000 and that the judgment had not been paid. The Sheriff of Neosho County was "commanded that of the goods and chattels of said Roger K. Reno, you cause the money above specified to be made and that more specifically a list of non-exempt property of Roger K. Reno includes the following (see attachment A) all located at 911 S. Garfield, Chanute, Kansas." Attachment A lists the following:

.357 Magnum pistol
.22-caliber pistol
20-gauge shotgun
Deer rifle with scope
2 antique squirrel guns
15-foot camper
Motorcycle.

The following account of events leading up to seizure of evidence from Reno's residence was given by Janice Jay: On September 9, 1993, Janice Jay, who is employed by the Neosho County Sheriff's Department as a process server, was directed to serve the execution papers on Reno. When she went to Reno's residence for the purpose of seizing the property listed in Attachment A, she was accompanied by another sheriff's deputy, Vicky Wright, and two officers from the Chanute Police Department, Don Umbarger and John Rausch. Jay knocked on the door of Reno's house. There was no answer. A man known to the police officers, James McCoy, came out of the camping trailer parked in the driveway. McCoy left after telling the officers that he thought Reno would be back shortly.

The camping trailer was one of the items to be seized. While looking it over to determine how to move it, the officers saw a set

of keys hanging in the door of the camping trailer. Deputy Jay used the radio in her car to get instructions from her supervisor, Undersheriff Roy Smith. On Smith's advice, the officers unlocked the residence with one of the keys.

Officer Rausch stayed outside to watch for Reno. The others went in. Deputy Wright found "a white powdery substance on a tray sitting on the dresser" in the bedroom. The officers all went back outside, and Deputy Jay again radioed Undersheriff Smith. She told him that they had found "numerous guns lying around on the floor on the furniture, seemingly just in the open," and that they had found what they believed to be drugs. According to Deputy Jay, "the undersheriff obtained two search warrants to the house and the garage, and he came back to the property where we carried out the search warrants."

Undersheriff Smith testified that when Deputy Jay radioed the second time, she said he was needed at Reno's residence where they had found guns and drugs. Smith went to the house. Inside, one of the deputies showed him marijuana seeds and a bottle of white powder in the kitchen and a piece of glass with white powder on it in the bedroom. Smith testified that these items were "in plain view." Using the information gained from entering the house, the undersheriff applied for a search warrant of the residence to search for illegal substances.

Smith's affidavit and application for the search warrant stated that the crimes of possession of cocaine, marijuana, and drug paraphernalia had been committed. Smith swore that the warrant would be used to search for "illegal substances, contraband or any other fruits or instrumentalities of above noted crimes." The application was based on the following facts:

"On September 9, 1993, at approximately 2:45 pm, Process Server, Janice Jay with the Neosho County Sheriff's Department was serving execution papers on an individual by the name of Roger Reno, who lives at above stated address. Along with Janice Jay was Vicky Wright and Roy Smith with the Sheriff's department and Don Umbarger and John Rausch with the Chanute Police Department. While looking for items listed on the execution papers, this affiant, Roy Smith, with the Sheriff's Department, noticed in the bedroom a substance which he believed to be cocaine on a piece of glass along with a razor blade next to it. In the kitchen, this affiant further noticed a clear plastic bottle with white powder substance

which this affiant believed to be cocaine and a shot glass full of seeds, which this affiant believes to be marijuana seeds. All such items were in plain view. At this time the search of the house was stopped in order that a search warrant could be executed.

"Whereupon, this affiant requests that a search warrant be issued to search the residence at 911 S. Garfield for illegal substances, contraband or any other fruits or instrumentalities of above noted crimes."

There is no mention of Reno's absence, his locked residence, or the officers' use of a key found in the camping trailer to gain access to the house.

Defense counsel moved to suppress the evidence seized in the search of Reno's residence. In the following words, the district court granted Reno's motion:

"I could find and the State provided no authority for the proposition that an execution provided the sheriff's department with sufficient authority to enter a locked premises. In reviewing the language of the execution itself, there's no specific language which would allow the State to enter the locked premises, and, in fact, the affidavit upon which they obtained the search warrant does not mention that the premises was locked or that the resident was not home. Consequently, I find that the sheriff's department in this case was there without authority, that it was a violation of the defendant's Fourth Amendment right, and that the evidence should be suppressed."

Stop and frisk. On October 12, 1993, Officer Mike Benard of the Chanute Police Department was on duty at approximately 2:24 a.m. While on routine patrol he saw two men "walking down the street carrying what appeared to be beverage containers in their hands." Benard stopped his patrol car beside the men and asked them to stop. They continued walking, and Benard again asked them to stop. The man later identified as Reno "picked up his pace." Running after Reno, Officer Benard saw him step around a bush near the curb and throw something. Benard saw an object fly through the air and heard something strike a parked car. Then Benard asked Reno and the other man to go back to the patrol car with him.

After another officer arrived at the scene, Benard looked for the object which Reno had thrown. On the ground "directly beside" a parked car, Benard found a small vial containing white powder. Reno denied any connection with the vial.

With regard to Reno's identification, Benard testified:

"At this point I had no idea who Mr. Reno was. I had asked for [I.D.'s] for both the individuals and given them to Sergeant Aikins, and I went to the car and came back. I had known just prior to this incident that Mr. Reno had been on television for Kansas' most wanted and what have you. So after Sergeant Aikins asked me if I knew who was standing there, I then realized who it was . . . ."

Once Benard identified Reno, he asked him if he had any weapons. Reno answered that "he didn't have anything on his person at all." Then Benard asked each man to place his hands on the patrol car for a pat-down. Benard found a knife in Reno's front pants pocket and a ballpoint pen casing in another pants pocket. He was arrested and charged with possession of cocaine and possession of drug paraphernalia, an "ink pen made into a straw."

When asked by defense counsel, "[W]hat reasonable suspicion did you have that they were violating . . . the law?", Officer Benard testified that he "had reason to believe that they were walking down the street with open containers." Chanute City Code § 5.16.130 (1996 Supp.) makes it unlawful for any person on a public street to have in his possession an open container of alcoholic liquor. Benard testified that he could see that Reno had in his left hand a bottle in which there was brown liquid sloshing around and a large C-Mart thermal cup in the other hand. Benard conceded that he could not tell if the liquid was root beer or whiskey. The other man had a bottle in a brown paper bag.

Officer Benard also testified that "[a]nytime I have anybody walking down the street at 2:30 in the morning in a residential neighborhood I'm going to stop and [I.D.] them." He agreed that this practice was "standard procedure," the policy followed by the late night shift. Asked whether that policy was the reason he stopped the two men, Benard answered, "That associated with the fact that they were carrying what appeared to be alcoholic beverages in their hands."

The district court found that Officer Benard

"was unable to articulate a reasonable suspicion of a violation of the law giving him probable cause to stop and make further inquiry. Consequently, anything that flowed from this illegal stop or this stop in violation of the defendant's rights

should be suppressed, and that would be, as I understand it, the Bic pen and the vial."

We first consider the admissibility of the evidence during the search of defendant's residence. Although the parties suggest standards of review which center on the trial court's findings, this is not a case where there is any real dispute about the facts material to the decision. The question whether the evidence was properly suppressed is a question of law. Our review on questions of law is unlimited. See *State v. Vandiver*, 257 Kan. 53, 56, 891 P.2d 350 (1995).

The State's first argument is that the evidence is admissible under the plain view doctrine. To this, Reno responds that the plain view doctrine has no application because the initial entry into his residence was unlawful. We agree.

In *State ex rel. Love v. One 1967 Chevrolet*, 247 Kan. 469, 476, 799 P.2d 1043 (1990), the court made the following general observations about the plain view doctrine:

"Warrantless searches, subject to a few exceptions, are per se unreasonable. *State v. Galloway*, 232 Kan. 87, 89, 652 P.2d 673 (1982), *cert. denied* 475 U.S. 1052 (1986). We have adopted the plain view exception set forth in *Coolidge v. New Hampshire*, 403 U.S. 443, 29 L. Ed. 2d 564, 91 S. Ct. 2022, *reh. denied* 404 U.S. 874 (1971). *State v. Galloway*, 232 Kan. at 87. Under *Galloway*, three basic requirements must be met before the plain view exception is applicable: (1) *The initial intrusion which afforded authorities the plain view must be lawful*; (2) the discovery of the evidence must be inadvertent; and (3) the incriminating character of the article must be immediately apparent to the searching authorities. 232 Kan. at 91.

"The inadvertence requirement of *Galloway* is not at issue in the instant action. We note, however, that the United States Supreme Court has recently eliminated inadvertence as a plain view exception requirement. *Horton v. California*, 495 U.S. [128], 110 L. Ed. 2d 112, 110 S. Ct. 2301 (1990)." (Emphasis added.)

With regard to the lawful intrusion requirement, the court stated:

" 'Plain view' provides grounds for seizure of an item when an officer's access to an object has some prior justification under the Fourth Amendment. *Texas v. Brown*, 460 U.S. 730, 738, 75 L. Ed. 2d 502, 103 S. Ct. 1535 (1983). See *Horton*, 110 L. Ed. 2d at 123. Plain view is not necessarily an independent exception to the Fourth Amendment, but an extension of whatever the prior justification for an officer's access to the object may be. *Brown*, 460 U.S. at 738-39." 247 Kan. at 476-77.

In *State v. Galloway*, 232 Kan. 87, 94, 652 P.2d 673 (1982), the court considered the argument that " 'exigent circumstances' [must] always be present before the plain view exception is applicable." The argument was rejected in favor of "the better view," which "is that the 'exigent circumstance' requirement applies only where the searching authority uses plain view as justification for the intrusion." 232 Kan. at 94. Thus, the three-pronged test, trimmed to two prongs in *Horton*, was established.

In the present case, no argument has been made that the incriminating character of the articles was not immediately apparent to the officers. The only question, therefore, is whether the initial intrusion which afforded authorities the plain view was lawful.

For Kansas authority for the intrusion, the State cites K.S.A. 60-2401. It provides, in part:

"(a) *Definitions*. A general execution is a direction to an officer to seize any nonexempt property of a judgment debtor and cause it to be sold in satisfaction of the judgment. A special execution or order of sale is a direction to an officer to effect some action with regard to specified property as the court determines necessary in adjudicating the rights of parties to an action. Notwithstanding the provisions of K.S.A. 60-706, and amendments thereto, executions served under this section shall be by personal service and not by certified mail return receipt requested. If personal service cannot be obtained, other forms of service of process are hereby authorized.

"(b) *By whom issued*. Executions and orders of sale shall be issued by the clerk at the request of any interested person and directed to the appropriate officers of the counties where they are to be levied.

. . . .

"(d) *Manner of levy*. Except as provided in subsection (a), a general execution shall be levied upon any real or personal nonexempt property of the judgment debtor in the manner provided for the service and execution of orders of attachment under K.S.A. 60-706 through 60-710, and amendments thereto. Oil and gas leaseholds, for the purposes of this article, shall be treated as real property. Special executions or orders of sale shall be levied and executed as the court determines."

The State characterizes the execution in this case as a special execution. Without actually saying so, Reno seems to assume that the execution is a general execution. The writ in question may be something of a hybrid in that it has some earmarks of both general and special executions, but the special execution indicators certainly predominate. The only significance would be in the different man-

ners of levy set out in K.S.A. 60-2401(d) for general and special executions if entry without consent into a locked residence were authorized for one but not the other. The parties agree, however, that there is no express prohibition or authorization for the action.

The State seems to be contending that, in the absence of authority limiting the force which can be used to gain possession of specified personal property, reasonableness is the test. Here, according to the State, it was reasonable to use the keys found in the trailer to unlock the door to the residence and enter. We do not agree.

Case law authority in this area is fairly scarce and tends to be quite antiquated. In these circumstances, the State has resorted to citing the legal encyclopedias for rules governing the manner of levy. The following generalizations are drawn from 30 Am. Jur. 2d, Executions, Etc. § 259:

"The courts differ as to what constitutes a forcible entry or breaking of an outer door or window, within the rule prohibiting forcible entry for the purpose of making a levy of execution in the debtor's dwelling. To constitute a forcible entry or breaking, it appears that it is not necessary that the door or window, or the locks or fastenings of either, be actually broken or destroyed. Thus, it has been stated that the mere raising of an outer window constitutes forcible entry, as does the entry through an open window, if that is not shown to be a usual place of entry. On the other hand, it has been held that the officer is permitted to open the outer door in the ordinary or usual manner, as by lifting the latch, turning the knob, sliding back the bolt where the door is left unlocked, or turning a key left in the lock.

"There is also authority to the effect that an officer may not force his way into a dwelling house to levy a writ of execution where the door is only partly closed, if there are persons within resisting his entrance. This holding is based on the principle that if an officer cannot enter peacefully before the door is shut, he ought not to attempt to enter, since such an attempt unavoidably endangers a breach of the peace and is as much a violation of the owner's right as if he had broken the door in the first instance."

Of these rules, the State particularly relies on the one which would permit an officer to turn a key left in the lock. The wording differs somewhat in the case cited, *Cate v. Schaum*, 51 Md. 299, 307 (1878), and obviously dilutes its benefit to the State's argument:

"[N]either the landlord nor his bailiff, in order to make distress of the tenant's goods, can lawfully break open gates, or break down inclosures, or force open the

outer door of any dwelling house or other building, or enter by a window which is found shut though not fastened; but it seems *the landlord or his bailiff may open the outer door by the usual means adopted by persons having access to the building, and therefore he may* open it by *turning the key*, by lifting the latch, or by drawing back the bolt. [Citations omitted.]" (Emphasis added.)

Only one case has been located which involves use of a key to unlock the door of the absent judgment debtor's residence. *People v. Sylva*, 143 Cal. 62, 76 Pac. 814 (1904), is an appeal from a conviction for assault. Sylva's threshold defense was that the victim, Pistolesi, was a trespasser on defendant's premises so that he had the right to use all the force necessary to expel the intruder. The California court concluded that the defense was ineffective because Pistolesi was not a trespasser. Here are the circumstances which were considered by that court:

"[T]he sheriff had an execution against the defendant under which he had previously levied upon some books of the defendant, which, by agreement, had been thereupon left in defendant's house pending further proceedings; that Pistolesi was the attorney for the execution plaintiff, and that at the time in question he was on the premises with the deputy sheriff, and at his request, to assist him in getting the books away; that when they reached the house the defendant was not at home, and they got from a small boy on the premises a key, with which they unlocked the door and so entered, and were standing in the entry with the door open at the time the defendant returned to his home and made the alleged assault. Under these circumstances Pistolesi was not a trespasser. The levy was good as against the defendant, though not sufficient against creditors and purchasers in good faith. [Citations omitted.] An officer charged with the duty of enforcing a judgment by execution has the right to enter the premises of the execution defendant, if he can do so peaceably. (11 Am. & Eng. Ency. of Law, 2d ed., 654.) He has also the right to take with him such persons as he may need to assist him in the duty. The defendant had no right to expel the officer or his assistant from the premises." 143 Cal. at 63.

Although at first glance *Sylva* seems to bear a remarkable similarity to the present case so that it might provide guidance for disposition of this appeal, there are several factors which distinguish it. First, the appeal was decided on grounds other than the lawfulness of Pistolesi's entry into Sylva's residence. 143 Cal. at 63-66. Second, facts material to Sylva's expectation with regard to entry, which might distinguish *Sylva* from the present case, are not ascertainable. The previous levy, the boy's having the key, and Syl-

va's singling out Pistolesi are circumstances in *Sylva* which may suggest that the officer's entry was anticipated (even made possible) by Sylva, but that Pistolesi's entry was not.

Third, the California court's construction of "peaceably," 143 Cal. at 63, is somewhat incompatible with modern decisions involving self-help repossession in commercial transactions. Even though the entry into Sylva's premises was punctuated by a threatened shooting, the court deemed it to have been done peaceably. In this interpretation, *method* of entry seems to be the sole consideration. In contrast, the focus of modern commercial litigation seems to be on potential for confrontation or incident so that a property seizure marred by an incident or altercation would not be deemed to be peaceable. There is a difference, of course, between a levy of execution by an authorized officer and self-help repossession by the creditor which may account for the different emphases. Commercial law is the one area in which there is a significant amount of current litigation involving the definitions of peaceable, peaceful, or breach of the peace.

This court addressed the question of what constitutes a breach of the peace in *Benschoter v. First National Bank of Lawrence*, 218 Kan. 144, 542 P.2d 1042 (1975). Benschoter signed a promissory note and security agreement secured by farm equipment. When Benschoter failed to make a scheduled payment, the creditor went to the debtor's house.

"Both the appellant and his wife were away from the home but their three children, ages seventeen, fifteen and thirteen were home. Mr. Kuhn went to the door of the appellant's house and asked the children to let him pick up the secured farm equipment. The hay conditioner was in the driveway in front of the barn. The cadet mower was in the barn. The appellant's seventeen-year-old son opened a padlocked gate protecting the equipment and helped them get the mower from the barn." 218 Kan. at 146.

In his challenge to the repossession, Benschoter argued that the property was taken by "stealth," by which he meant taken in his absence and arguably when the creditor knew he would be absent, thus committing a breach of the peace in violation of K.S.A. 84-9-503. See 218 Kan. at 152. The statute provides, in part: "Unless otherwise agreed a secured party has on default the right to take

possession of the collateral. In taking possession a secured party may proceed without judicial process if this can be done without breach of the peace or may proceed by action." The Kansas Comment 1983 to this section states, in part:

"Nothing in this section or elsewhere in Article 9 defines the term 'breach of the peace.' The courts are left with that job. The leading Kansas case is *Benschoter v. First Nat'l Bank of Lawrence, supra*, where the court held that 'stealth' does not constitute a breach of the peace. On the other hand, there are cases holding that a secured creditor accompanied by the sheriff, leaving the impression that a court order has been issued when in fact it hasn't, is a breach of the peace because of the misrepresentation which is created. *Stone Mach. Co. v. Kessler*, 463 P.2d 651 (Wash. App. 1970). Forced entry into the debtor's premises would almost certainly be considered a breach of the peace, and the UCCC expressly so provides for consumer repossessions. K.S.A. 16a-5-112."

## K.S.A. 16a-5-112 provides:

"Upon default by a consumer, unless the consumer voluntarily surrenders possession of the collateral to the creditor, the creditor may take possession of the collateral without judicial process only if possession can be taken without entry into a dwelling and without the use of force or other breach of the peace."

## The Kansas Comment 1995 to this section states, in part:

"Under the UCC, a secured creditor has the right to take possession of collateral without resorting to legal process if it can be done without a 'breach of the peace.' K.S.A. 84-9-503. This term is generally left to case law definition, but it raises delicate problems when it comes to repossessing furniture or other property that is within a home or apartment. The disputes that result from such a situation are rarely the type that get to the appellate courts for resolution. It is necessary, therefore, to make it clear that dwellings cannot be entered absent the consent of the occupants except under the supervision of the court."

It is worth noting that Restatement (Second) of Torts § 208 (1963) deals with entry to execute civil process against the occupant:

"(1) The privilege to execute civil process pursuant to a writ which is either valid or fair on its face, carries with it the privilege to enter land in the possession of another for the purpose of executing such process against the person, land, or goods of the possessor or an occupant of the land.

"(2) The actor is not privileged to break and enter a dwelling in order to execute such process, unless he has already peaceably and without fraud entered the dwelling and has been forcibly ejected before completion of the execution of the process."

Comment *e* directs the reader to Comment *b* under Restatement (Second) of Torts § 206 (1963) for the following definition of "break":

"The word 'break' is here used in the same sense in which it is used in defining the crime of burglary, and includes the breaking or destruction of any portion of the outer part of a building or enclosure used for its protection or the change in location of any such part, such as the moving or pushing aside of any object placed there as a barrier."

The appendices to the Restatement (Second) of Torts after 1963 contain no cases citing §208.

Finally, we note that in the criminal law context, this court applies a heightened standard for reasonableness when entry into a suspect's residence is involved. In *State v. Platten*, 225 Kan. 764, 594 P.2d 201 (1979), the defendant was arrested without a warrant within the privacy of his home. This court affirmed the district court's order suppressing evidence seized within the house pursuant to the arrest. The court stated:

"The Fourth Amendment protects a citizen's reasonable expectations of privacy and one's reasonable expectation of privacy in the home is entitled to unique sensitivity. *United States v. Martinez-Fuerte*, 428 U.S. 543, 561, 565, 49 L. Ed. 2d 1116, 96 S. Ct. 3074 (1976); *Katz v. United States*, 389 U.S. 347 [, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967)]." 225 Kan. at 769.

This expectation of privacy in one's home is no less uniquely sensitive in a civil context, nor is the entry by a law enforcement officer less intrusive because the officer is serving a writ of execution.

Although there is a certain emphasis on the distinction between self-help repossession and legal process in our statutes and Comments, there is no indication that "peaceable" is not a requirement of both. This is particularly true here where the writ of execution is issued by the clerk and not by the court. Further, because the major distinction is in the inapplicability of constitutional protections to self-help repossession, the "peaceable" requirement for the levy of a writ of execution by a law enforcement officer should be stricter than for self-help repossession by a private citizen.

The debtor's expectation of privacy in a dwelling is the primary consideration in determining the lawfulness of an entry. The standard for entry into a dwelling is justifiably higher than for entry

into any other structure because of the higher expectation of privacy in one's dwelling. Clearly, a locked dwelling door is to be treated as if it had been locked for the purpose of preventing entry.

In this case, the door to Reno's house was locked. Entry into the dwelling was thereby prevented. Entry was gained by the officer levying the execution and the officers accompanying her due to the happenstance that a key to the front door was found in the camping trailer parked on the lot. The key was on a ring with other keys, and its match to the front door lock was not immediately apparent. Although the availability of the key compromised the security of the dwelling, it does not demonstrate any significant diminution of Reno's expectation of privacy in his house. The officers' use of the key to gain entry, therefore, constituted an unlawful entry. In the vocabulary of the levy and repossession cases, the entry did not constitute a peaceable or reasonable entry in that it violated Reno's expectation of privacy in his house.

Another reason for finding that the entry was unlawful apparently figured in the district court's decision. The district court judge stated, "In reviewing the language of the execution itself, there's no specific language which would allow the State to enter the locked premises." We assume this refers to the statutory provision for levying special executions "as the court determines." K.S.A. 60-2401(d). We interpret the district court's rationale to have been that entry into a locked dwelling would be prohibited unless specifically authorized by the court. Here, the writ of execution was not an order of the court authorizing the officers to enter the locked residence of the defendant. Such an order could be issued in aid of execution under K.S.A. 60-2419.

We conclude that the officers' initial intrusion into Reno's house was unlawful, and the evidence is not admissible under the plain view doctrine.

The State's fallback position is based on *United States v. Leon*, 468 U.S. 897, 82 L. Ed. 2d 677, 104 S. Ct. 3405 (1984), in which the Court held that evidence obtained in reasonable reliance on a defective search warrant is admissible. Applying *Leon* to this case, the State contends that the evidence seized from Reno's house is admissible because there was no showing of bad faith on the part

of the officers who executed the search warrant. The State contends that if the entry was unlawful, it was "cured" by the officers' obtaining a search warrant before reentering the house and seizing the contraband.

The State's fallback position fails because *Leon* does not apply in the instant case. The admissibility of the evidence depends not on the good faith of the seizing officers but, rather, on the source of the information used to obtain the search warrant. The officers' unlawful entry taints the evidence under the fruit of the poisonous tree doctrine. The question is whether the State can remove the taint under the "independent source" doctrine and not whether the subsequent search warrant cures the unlawful entry.

The "independent source" doctrine is recognized by the United States Supreme Court as one of several means of removing the taint from such evidence. If the State can show that the seizure of the evidence resulted from a source independent from the unlawful entry, the evidence will be admitted.

In *Murray v. United States*, 487 U.S. 533, 101 L. Ed. 2d 472, 108 S. Ct. 2529 (1988), the admissibility of evidence seized by federal agents through conduct similar to that which occurred in the instant case was before the United States Supreme Court. In *Murray*, federal agents observed suspected drug traffickers, including the two defendants, remove vehicles from a warehouse and then turn the vehicles over to others to drive. The vehicles were later stopped and lawfully seized and found to contain marijuana. The federal agents then entered the warehouse without a warrant, observed a number of bales of marijuana, and left. The agents then applied for a warrant to search the warehouse without mentioning the first entry or relying on any observations made in the warehouse, *i.e.*, the presence of the bales of marijuana. Armed with the search warrant, the agents reentered the warehouse and seized the bales of marijuana.

In discussing the policy behind the "independent source" doctrine, the Supreme Court said:

"We see the incentives differently. An officer with probable cause sufficient to obtain a search warrant would be foolish to enter the premises first in an unlawful manner. By doing so, he would risk suppression of all evidence on the premises,

both seen and unseen, since his action would add to the normal burden of convincing a magistrate that there is probable cause the much more onerous burden of convincing a trial court that no information gained from the illegal entry affected either the law enforcement officers' decision to seek a warrant or the magistrate's decision to grant it. . . . Nor would the officer *without* sufficient probable cause to obtain a search warrant have any added incentive to conduct an unlawful entry, *since whatever he finds cannot be used to establish probable cause before a magistrate.*" (Emphasis added.) 487 U.S. at 540.

The Supreme Court further stated:

"To apply what we have said to the present cases: Knowledge that the marijuana was in the warehouse was assuredly acquired at the time of the unlawful entry. But it was also acquired at the time of entry pursuant to the warrant, and if that later acquisition was not the result of the earlier entry there is no reason why the independent source doctrine should not apply." 487 U.S. at 541.

The Supreme Court identified the question before it as

"whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue here. This would not have been the case if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant." 487 U.S. at 542.

Although the federal district court found that the agents did not reveal the warrantless entry or what they observed in the warehouse, "[i]t did not, however, explicitly find that the agents would have sought a warrant if they had not earlier entered the warehouse." 487 U.S. at 543. For that reason, the district court's denial of the defendants' motion to suppress was vacated, and the case was remanded for the district court to make that determination.

Here, the application for the search of defendant's residence does not mention the method of entering defendant's residence but clearly stated what the officers observed while in the residence. It is undisputed that the officers were "prompted to seek the search warrant" by their observation of marijuana in the initial entry, and that observation was presented to the magistrate and was the sole basis of requesting the search warrant. Thus, the "independent source" doctrine does not apply, and the evidence seized as a result of the execution of the search warrant is not admissible.

The district court correctly found the initial entry to be illegal but suppressed the evidence based on the failure of the State to inform the magistrate of the circumstances of the initial entry. The district court took its cue from the State's argument that *Leon* applied.

The State fails to address the question of omissions and misleading statements in the affidavit. Instead, it frames the question of the executing officers' reasonable reliance on the search warrant as one of uncertainty about the lawfulness of entering the locked dwelling. Here is the State's argument:

"[N]or was it entirely unreasonable for an officer to believe the warrant valid. Even if the court finds now, in retrospect, that the sheriff has no power to enter peaceably, a dwelling in order to gain possession of items in a special execution, the deputies could not have known at the time that this would be the court's ruling. If the court now rules that this first entry into the dwelling of Reno 'taints' the warrant, then it punishes the officers for failing to predict what would be the court's interpretation of the civil execution law. This is surely not an act of bad faith on the part of the officers."

The twisted logic of this argument seems to spring from the misconception that the district court found bad faith in the initial intrusion. In fact, what the district court commented on were the less than candid aspects of the affidavit supporting the warrant. One of those aspects was concealment of the nature of the initial intrusion. If the affiant had revealed the actual circumstances of the entry and the subsequent discovery of contraband and the magistrate had issued the warrant, there would be no issue of bad faith. Interpretation of the civil execution law in that case would have been left up to the magistrate. The affidavit was misleading, though, due to omissions and false implications by the police. Even if *Leon* applied, a search warrant issued by a magistrate from whom material facts had been withheld cannot be reasonably relied upon by the officer.

In summary, if the initial entry into Reno's locked house was lawful, the drugs and drug paraphernalia seen in plain view inside the house could have been seized without a warrant and have been admissible under the plain view doctrine. Since the initial entry was unlawful, the plain view doctrine is not applicable; thus, what

the officers observed in plain view cannot be subsequently used as the basis for obtaining a search warrant. The district court did not err in suppressing the evidence seized from defendant's residence.

We next consider the admissibility of the evidence seized during the officers' encounter with defendant on a public street. The State argues that Reno's discarding the vial of white powder was not a response to police misconduct and that the vial, therefore, is admissible. The State's argument depends on Officer Benard's initial stop of Reno being valid.

Reno contends the officer did not have a reasonable and articulable suspicion that he had committed, was committing, or was about to commit a crime as required by K.S.A. 22-2402. Reno also contends that the stop in the present case also was made as a matter of standard procedure. Officer Benard testified that he always stopped persons walking in residential neighborhoods in the early morning hours, and he conceded that the stop was due at least in part to this "standard procedure."

In *State v. McKeown*, 249 Kan. 506, 509-10, 819 P.2d 644 (1991), we said:

"An officer who does not have reasonable suspicion to justify a *Terry* stop may, however, approach an individual on the street for investigative purposes. *State v. Epperson*, 237 Kan. 707, 713, 703 P.2d 761 (1985); *State v. Marks*, 226 Kan. 704, 708-09, 602 P.2d 1344 (1979). The officer can ask the individual's name and request identification but cannot force the individual to answer. The individual is free to leave.

"In *Florida v. Royer*, 460 U.S. 491, 497, 75 L. Ed. 2d 229, 103 S. Ct. 1319 (1983), the United States Supreme Court reasserted that the Fourth Amendment was not violated by a law enforcement officer's merely approaching an individual on the street or other public place, asking him questions if he is willing to answer, or putting questions to him if he is willing to listen. See *Dunaway v. New York*, 442 U.S. 200, 210 n.12, 60 L. Ed. 2d 824, 99 S. Ct. 2248 (1979); *Terry v. Ohio*, 392 U.S. at 34 (White, J., concurring). The Court in *Royer* noted:

'The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. *Terry v. Ohio*, 392 U.S. at 32-33 (Harlan, J., concurring); *id.*, at 34 (White, J., concurring). He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds. *United States v. Mendenhall*, [446 U.S. 544, 556 (1980)] (opinion of Stewart, J.). If there is no detention—no seizure within the

meaning of the Fourth Amendment—then no constitutional rights have been infringed.' 460 U.S. at 497-98.

"The stop of a vehicle being driven upon the streets, however, is different than merely approaching an individual in a public place. Such a stop always constitutes a seizure. Therefore, to stop a moving vehicle an officer must have articulable facts sufficient to constitute reasonable suspicion under K.S.A. 22-2402 and *Terry*. *Delaware v. Prouse*, 440 U.S. 648, 661-63, 59 L. Ed. 2d 660, 99 S. Ct. 1391 (1979). To stop a vehicle to investigate circumstances which provoke suspicion, an officer must be aware of 'specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion' that the vehicle contains individuals involved in criminal activity. *United States v. Brignoni-Ponce*, 422 U.S. 873, 884, 45 L. Ed. 2d 607, 95 S. Ct. 2574 (1975)."

In *State v. Johnson*, 253 Kan. 75, 80, 853 P.2d 34 (1993), we said:

"The stop of a vehicle, under the circumstances set forth in K.S.A. 1992 Supp. 22-2402 and *Terry*, is different than merely approaching an individual in a public place. Such a stop always constitutes a seizure. Therefore, to stop a moving vehicle an officer must have articulable facts sufficient to constitute reasonable suspicion. See *Delaware v. Prouse*, 440 U.S. 648, 661-63, 59 L. Ed. 2d 660, 99 S. Ct. 1391 (1979). To stop a vehicle to investigate circumstances which provoke suspicion, an officer must be aware of 'specific articulable facts, together with rational inferences from the facts, that reasonably warrant suspicion' that the vehicle contains individuals involved in criminal activity. *United States v. Brignoni-Ponce*, 422 U.S. 873, 884, 45 L. Ed. 2d 607, 95 S. Ct. 2574 (1975). See *State v. McKeown*, 249 Kan. at 510."

However, in the present case, Officer Benard had reason to suspect that Reno was violating Chanute Municipal Code § 5.16.130 in that he had in his possession an open container of alcoholic liquor. Thus, this court's decision in *State v. Guy*, 242 Kan. 840, 752 P.2d 119 (1988), is controlling. In *Guy*, this court held:

"Here, when the stop was made, an officer had observed the Cadillac being driven at a speed in excess of 100 miles per hour—clearly in excess of the then maximum speed limit on that interstate highway, 55 miles per hour. Under K.S.A. 22-2402, an officer may stop a person whom he sees commit a crime, whether it be a felony, a misdemeanor, or a traffic offense. K.S.A. 1987 Supp. 21-3105, and 22-2402.

"The detectives here involved were not traffic officers. They were not driving on Interstate 70 with the primary purpose of enforcing the traffic code. They had a hunch or a suspicion that defendants were involved in drug trafficking, but they had no sound basis, no facts, upon which to reach that conclusion. When the Cadillac exceeded the speed limit by more than 45 miles per hour, however, the law enforcement officers who observed that conduct had a lawful basis upon which to stop the vehicle.

"The officers were candid in stating their underlying and principal purpose in pursuing and stopping the vehicle. Had the stop been made as defendants turned onto the Interstate highway, and before either officer observed any unlawful conduct, we would have an entirely different situation. However, that is not the case before us. Detective Poore observed a violation of the law. Whatever his underlying motive, he had the authority and the duty at that point to stop the speeding car." 242 Kan. at 843-44.

The stop was valid pursuant to K.S.A. 22-2402(1) and, thus, the subsequent frisk of Reno was permissible under 22-2402(2). We conclude the district court erred in suppressing the use of the vial and pen casing as evidence against Reno.

The State's appeal in case No. 93CR333CH is denied. The State's appeal in case No. 93CR385CH is sustained.