(78 P.3d 1178)
No. 88,654
No. 88,656

STATE OF KANSAS, *Appellee*, v. JIMMY W. CAMPBELL, *Appellant*.

Opinion filed November 7, 2003.

*Rick Kittel*, assistant appellate defender, for appellant.

*Thomas R. Stanton*, deputy district attorney, *Keith E. Schroeder*, district attorney, and *Phill Kline*, attorney general, for appellee.

Before ELLIOTT, P.J., JOHNSON, J., and LARSON, S.J.

LARSON, J.: In this direct appeal, Jimmy W. Campbell raises numerous issues relating to his convictions and sentences to possession and manufacturing of methamphetamine and its precursors.

The issues raised concern (1) improper sentencing under K.S.A. 65-7006, (2) multiplicitous convictions, and (3) erroneous denials of separate motions to suppress in two different cases.

The two cases were not consolidated below but were heard at one bench trial based on stipulated facts and the testimony and record of the suppression and preliminary hearings. The two cases have been appealed together to our court, and we consider them as one appeal. We first set forth the facts in the separate cases.

## Case No. 00 CR 779

The issue in this case relates to whether there was a valid consent to search after a traffic stop. The stipulated facts set forth a waiver of jury trial by the parties, renewal of Campbell's objections to consideration of physical evidence, reservation of the right to appeal the court's previous denial of the motion to suppress, and then sets forth the following:

"4. The investigating officers in this case would testify consistently with their prior testimony at the hearing on the motion to suppress held July, 19, 2001, and said testimony is hereby incorporated by reference. A summary of the evidence as it would be presented by the investigating officers and witnesses in this case is as follows:

"a. Wade Isaacson is employed as a deputy by the Reno County, Kansas, Sheriff's Department.

"b. At approximately 3:45 a.m. on September 11, 2000, Deputy Isaacson was on patrol in uniform in a marked patrol car south bound on Airport Road approaching U.S. 50 in Reno County, Kansas, when he observed a 1980 Chevrolet pickup truck bearing Kansas registration plate OVT 016 in front of him. Deputy Isaacson saw that the truck's brake lights were not working.

"c. Deputy Isaacson followed the truck to the intersection of U.S. 50 and K 61 to insure that the brake lights were not functioning. Deputy Isaacson stopped the truck at that point. The driver of the truck was identified as the defendant, Jimmy W. Campbell. Deputy Isaacson could smell the odor of alcoholic beverage coming from within the truck, and he asked the defendant to exit the vehicle. Deputy Isaacson could smell the odor of an alcoholic beverage upon the person of the defendant, and he asked the defendant to take a preliminary breath test.

"d. Deputy Isaacson would testify that before administering the test he asked for consent to search the defendant's person, and that the defendant gave him consent to search his person. Upon searching the defendant, Deputy Isaacson seized a small clear baggie containing what appeared to be a controlled substance from the coin pocket of the defendant's pants. The defendant was arrested based on the deputy's belief that the powder was methamphetamine.

"5. The defendant would maintain his testimony that he did not give the deputy consent to search, or, in the alternative that his consent was not voluntary."

Paragraphs 6, 7, and 8 stipulate that a proper chain of custody of the physical evidence was preserved, the controlled substances were found to be methamphetamine, and the evidence was sufficient for the trial court to find Campbell guilty as charged of possession of methamphetamine.

## Case No. 01 CR 147

The issues in this case again relate to the validity of the search but on appeal the multiplicity and sentence issues are also raised. The stipulation of facts, as in the earlier case, sets forth a waiver of jury trial by the parties, renewal of Campbell's objections to the admission of physical evidence based on his motion to suppress, reservation of the right to appeal the trial court's denial of his motion to suppress, and then sets forth the following:

"4. The investigating officers in this case would testify consistently with their prior testimony at the preliminary hearing and the hearing on the motion to suppress held July 30, 2001, and said testimony is hereby incorporated by reference. A summary of the evidence as it would be presented by the investigating officers and witnesses in this case is as follows:

"a. On the 8th day of December, 2000, officers of the Hutchinson Police Department obtained a search warrant for 16 West 10th, Apt. 4, Hutchinson, Reno County, Kansas. Before executing the warrant, the officers discussed the entry and it was made clear to Sgt. McClarty of the police department that the apartment in question was the apartment at the top of the stairs to the left. Sgt. McClarty stated in his police report of the incident that Sgt. Fesler had informed him that officers were supposed to go in the front doors upstairs and enter the apartment to the left. At approximately 9:28 p.m. on December 8, 2000, Sgt. McClarty, Sgt. Fesler, Officer Robertson and Officer Harcrow executed the search warrant. Upon arrival at the top of the stairs, Sgt. McClarty observed two females in the doorway of apartment #4, and apartment #4 was to the right at the top of the stairs. Sgt. McClarty saw the doorway to the left standing open, and that apartment was later identified as apartment #3. Sgt. McClarty saw that there was no number visible at the top of the stairs at apartment #3.

"b. From his position at the top of the stairs, Sgt. McClarty could observe through the open door of apartment #3 a can of Coleman fuel sitting on the floor immediately inside the doorway and slightly to the left. He also observed two glass jars just inside the doorway sitting in the middle of the living room floor. Sgt. McClarty looked through the crack between the door and door frame and observed a white male later identified as the defendant Jimmy W. Campbell, in the kitchen area carrying a clear glass dish. He also observed that the microwave was running. Based on his training and experience, Sgt. McClarty believed that the defendant was in fact in the process of manufacturing methamphetamine.

"c. Sgt. McClarty ordered the defendant to put down the glass dish and, after looking back and forth between the dish and the officer several times, the defendant complied. Officers entered the apartment to secure it and to seize the defendant. In securing the apartment, Sgt. McClarty observed that the dish that had been in the possession of the defendant upon the officers' arrival had an unknown cloudy clear liquid in it. Sgt. McClarty also observed a blender, a beaker

with a funnel and a coffee filter draining into it and a glass jar in plain view in the residence. Sgt. McClarty also noted a strong chemical odor which he associated with the manufacturing of methamphetamine.

"d. Officers secured the apartment and obtained a search warrant for apartment #3."

Subparagraph "e" then sets forth a detailed page of items seized from the apartment claimed to be utilized in the manufacture of methamphetamine; paragraphs 5 and 6 stipulate to a proper chain of custody; paragraph 7 stipulates to the testing of items as being marijuana, pseudoephedrine, methanol, and methamphetamine; paragraph 8 stipulates that Campbell had previously been convicted of possession of marijuana; and paragraph 9 states:

"9. The evidence in this case is sufficient for this Court to determine in its discretion a verdict on the following charges: manufacture of methamphetamine, a level one drug felony pursuant to K.S.A. 2000 Supp. 65-4159; unlawful possession of ephedrine or pseudoephedrine, a level one drug felony pursuant to K.S.A. 2000 Supp. 65-7006; possession of methamphetamine with the intent to sell, a level three drug felony pursuant to K.S.A. 2000 Supp. 65-4161; possession of drug paraphernalia with intent to manufacture methamphetamine, a level four drug felony pursuant to K.S.A. 2000 Supp. 65-4152(a)(3); and possession of marijuana, a level four drug felony pursuant to K.S.A. 2000 Supp. 65-4162(a)(3)."

Additional evidence that was considered by the trial court arose in the two suppression hearings that are the principal contentions of this appeal. The suppression hearing in No. 00 CR 779 had evidence relating to the unexplained loss of audio on the videotape of the stop, testimony of Deputy Isaacson as indicated in the factual stipulations, and Campbell's testimony.

Campbell admitted he had told the deputy he had consumed alcohol earlier in the evening but denied he gave consent to search his truck. On cross-examination, he admitted he showed the deputy items in the back of the truck and he knew from a prior incident he had the right to deny consent to search. In response to the prosecutor's question, "You didn't tell him, 'no, you can't go into my pockets?'" Campbell answered, "I can't recall, to tell you the truth, I don't believe I said no, I don't remember." The last answer Campbell gave his counsel was, "I just would do whatever he wanted me to do."

The trial court viewed the videotape and found the stop was valid, Campbell did give consent to search his person, and there was no coercion by the officer making the consent voluntary.

In the suppression hearing in No. 01 CR 147, the State called McClarty and Fesler who testified consistent with the stipulation of facts previously set forth. The trial court, in denying the motion to suppress, found the initial entry was lawful because there was a search warrant for apartment #4 and the plain view observations of Sgt. McClarty combined with the odors he detected coming from the adjoining apartment warranted the initial intrusion into Campbell's apartment. The subsequent search after obtaining a search warrant after securing the apartment was lawful.

The trial court reviewed the stipulations in both cases, the records and rulings previously made, and found Campbell guilty as charged in both cases.

Campbell was sentenced to 20 months in prison for possession of methamphetamine in No. 00 CR 779. In No. 01 CR 147, he was sentenced as follows: 120 months for manufacture of methamphetamine, 120 months for possession of ephedrine or pseudoephedrine with the intent to manufacture methamphetamine, 15 months for possession of methamphetamine with the intent to sell, 11 months for possession of drug paraphernalia with the intent to manufacture methamphetamine, and 11 months for felony possession of marijuana. The 120-month sentences resulted from granting of defendant's motion for downward durational departure. All sentences were ordered to run concurrently.

## Suppression motions

We first consider Campbell's arguments relating to the two suppression motions. If his contentions prove to be meritorious, his other issues need not be considered. The first issue is whether Campbell gave a valid consent to be searched. The second turns on our application of the plain view exception to the Fourth Amendment to the United States Constitution protection against "unreasonable" searches and seizures. Our standards of review are well known.

When reviewing a motion to suppress evidence, an appellate court reviews the factual underpinnings of a trial court's decision by a substantial competent evidence standard and the ultimate legal conclusion drawn from those facts by a de novo standard. An appellate court does not reweigh the evidence. The ultimate determination of the suppression of evidence is a legal question requiring independent appellate review. *State v. Alvidrez*, 271 Kan. 143, 145, 20 P.3d 1264 (2001).

On a motion to suppress, the State bears the burden of proving the lawfulness of the officer's conduct. *State v. Houze*, 23 Kan. App. 2d 336, 337, 930 P.2d 620, *rev. denied* 261 Kan. 1088 (1997). The determination concerning the voluntariness of a consent to search is a question of fact for the trier of fact, and the determination will not be overturned on appeal unless clearly erroneous. *State v. Hardyway*, 264 Kan. 451, 456, 958 P.2d 618 (1998).

Warrantless searches are unreasonable, subject to a few well-defined exceptions. *State v. Richmond*, 30 Kan. App. 2d 1008, 1011, 52 P.3d 915 (2002). One of the exceptions to the search warrant requirement is consent, which must be voluntarily, intelligently, and knowingly given and proven by a preponderance of the evidence. To establish consent, it must be clear that the search was permitted or invited by the individual whose rights are in question without duress or coercion. *State v. Kriegh*, 23 Kan. App. 2d 935, 938, 937 P.2d 453 (1997).

Clearly, there was contradictory evidence as to whether consent was given. When such a conflict exists, great reliance must be placed upon the finder of fact. *State v. Jacques*, 270 Kan. 173, 188, 14 P.3d 409 (2000). We must not reweigh the facts and substitute our judgment for that of the trial court. In this case, it is clear that Deputy Isaacson's version of the stop and encounter was given greater credence than Campbell's.

There was substantial competent evidence to justify the stop, the request for a preliminary breath investigation, and the voluntary consensual search of Campbell's person leading to the discovery of methamphetamine. The detention preceding the search was not improper, and even if it had been, the voluntary consent removes any taint of illegality. *State v. Boyd*, 30 Kan. App. 2d 720,

725, 47 P.3d 419 (2002), *rev'd on other grounds* 275 Kan. 271, 64 P.3d 419 (2003). We have thoroughly reviewed the record and find there was substantial competent evidence for the trial court to find Campbell voluntarily and without coercion consented to the search which led to the evidence justifying the conviction for possession of methamphetamine in No. 00 CR 779.

We need not, when considering the appeal from the denial of the suppression motion in No. 01 CR 147, look to the arguments relating to the sufficiency of the affidavit to secure the search warrant or whether the good faith exception of *United States v. Leon,* 468 U.S. 897, 82 L. Ed. 2d 677, 104 S. Ct. 3045, *reh. denied* 468 U.S. 1250 (1984), applies. This issue can be resolved by looking, as the trial court did, to the incriminating nature of the articles and activity which were immediately apparent to the law enforcement officers through the open door to Campbell's apartment.

Although warrantless searches are per se unreasonable, Kansas adopted the plain view exception of *Coolidge v. New Hampshire,* 403 U.S. 443, 29 L. Ed. 2d 564, 91 S. Ct. 2022, *reh. denied* 404 U.S. 874 (1971), in *State v. Galloway,* 232 Kan. 87, 90-94, 652 P.2d 673 (1982). Under *Galloway,* three basic requirements must be met before the plain view exception is applicable: (1) The initial intrusion which afforded authorities the plain view must be lawful, (2) the discovery of the evidence must be inadvertent, and (3) the incriminating character of the article must be immediately apparent to the searching authorities. 232 Kan. at 91, 94. Inadvertence was subsequently eliminated as a plain view exception requirement in *Horton v. California,* 496 U.S. 128, 110 L. Ed. 2d 112, 110 S. Ct. 2301 (1990); see *State ex rel. Love v. One 1967 Chevrolet,* 247 Kan. 469, 476, 799 P.2d 1043 (1990); Campbell does not contend the law enforcement officers were unlawfully in front of his apartment, so we will concentrate on the incriminating character of the articles and whether they were immediately apparent to the searching authorities.

Sergeant McClarty's testimony clearly showed the door to Campbell's apartment was "standing open." He could see Campbell in the kitchen carrying a pan. A microwave was in operation, McClarty could smell a chemical odor associated with the manu-

facture of methamphetamine which he had smelled "multiple times" in the past. He could see a Coleman fuel can in the living room along with glass jars. McClarty testified the microwave was being used to cook solvent to obtain pure ephedrine and the dish in Campbell's hands was being used to manufacture methamphetamine. Under the totality of the circumstances, he had no hesitancy in saying the items he plainly viewed represented the active process of methamphetamine manufacture.

Although Campbell argues the items viewed were lawful in isolation, the officer had specialized training, had served on the Reno County Drug Task Force from 1996 until 1999, and under the totality of the circumstance, we hold, as the trial court did, that the incriminating character of the articles and the unlawful activity was immediately apparent, the plain view exception applied, the warrantless entry into Campbell's apartment was proper, the second application for a search warrant was lawful, and the suppression motion was properly denied.

With the two basic challenges to the convictions now disposed of, we turn to the arguments on appeal concerning the claimed multiplicity and the sentence imposed under K.S.A. 65-7006.

### *Multiplicity*

Campbell contends on appeal that his convictions on the charges of manufacture of methamphetamine, K.S.A. 65-4159, and possession of ephedrine/pseudoephedrine, K.S.A. 65-7006, are multiplicitous.

Whether convictions are multiplicitous is a question of law subject to unlimited review. *State v. Robbins*, 272 Kan. 158, 171, 32 P.3d 171 (2001).

Campbell argues that possession of ephedrine is a lesser included offense of manufacturing methamphetamine and also that possession of ephedrine is a necessary element of manufacture making his convictions of both offenses a violation of his double jeopardy rights of the Fifth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights.

As has been recently held by our court in *State v. Lundquist*, 30 Kan. App. 2d 1148, 1151-52, 55 P.3d 928 (2002):

" 'Multiplicity is the charging of a single offense in several counts of a complaint or information. The primary concern with multiplicity is that it creates the potential for multiple punishments for a single offense. *State v. Vontress*, 266 Kan. 248, 255, 970 P.2d 42 (1998). Such multiple punishments are prohibited by the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights. *Brown v. Ohio*, 432 U.S. 161, 165, 53 L. Ed. 2d 187, 97 S. Ct. 2221 (1977); *State v. Edwards*, 250 Kan. 320, 329, 826 P.2d 1355 (1991). . . .'

" 'The concept of multiplicity in Kansas comes from two sources. The first is the traditional "common-law" multiplicity concept. This exists where the State attempts to use a single wrongful act as the basis for multiple charges and is based on the merger of the charges. *State v. Garnes*, 229 Kan. 368, 372, 624 P.2d 448 (1981). This concept has been a part of Kansas law since at least our decision in *State v. Colgate*, 31 Kan. 511, 515, 3 Pac. 346 (1884), wherein we stated: "[U]pon general principles a single offense cannot be split into separate parts, and the supposed offender be prosecuted for each of such separate parts, although each part may of itself constitute a separate offense." The test for whether the offenses merge and are, therefore, multiplicitous is whether each offense charged requires proof of a fact not required in proving the other; if so, then the offenses do not merge and are not multiplicitous. *Garnes*, 229 Kan. at 373. Offenses also do not merge if they are committed separately and severally at different times and at different places. 229 Kan. at 373.' *State v. Garcia*, 272 Kan. 140, 143-44, 32 P.3d 188 (2001).

"The second source of multiplicity is statutory. K.S.A. 21-3107(2)(d) defined an included offense as 'a crime necessarily proved if the crime charged were proved' and stated that a defendant could not be convicted of both the crime charged and the included offense. This statute was amended in 1998, and subsection (2)(d) was eliminated. L. 1998, ch. 185, § 1. It was replaced with language which defined an included crime as 'a crime where all elements of the lesser crime are identical to some of the elements of the crime charged.' See K.S.A. 2001 Supp. 21-3107(2)(b). The present statutory language in essence mirrors the common-law elements test, thereby leaving it as the only remaining test for multiplicity. See also *State v. Saiz*, 269 Kan. 657, 662-63, 7 P.3d 1214 (2000) (for crimes committed after effective date of 1998 amendment of K.S.A. 21-3107, second prong of *State v. Fike*, 243 Kan. 365, 757 P.2d 724 [1988] disregarded)."

K.S.A. 65-7006(a) governs the possession of ephedrine and reads in applicable part: "It shall be unlawful for any person to possess ephedrine, pseudoephedrine, red phosphorus, lithium metal, sodium metal, iodine, anhydrous ammonia, pressurized ammonia or phenylpropanolamine, or their salts, isomers or salts of isomers with intent to use the product to manufacture a controlled substance."

K.S.A. 65-4159 criminalizes the unlawful manufacture of methamphetamine. It reads: "(a) Except as authorized by the uniform controlled substances act, it shall be unlawful for any person to manufacture any controlled substance or controlled substance analog."

The test for multiplicity as established by the *Garcia* opinion requires us to make an element analysis of the two crimes. In this case, in order to find Campbell guilty of possession of ephedrine, the State was required to prove that he knowingly possessed the substance with intent to use the product to manufacture a controlled substance. See PIK Crim. 3d 67.27. In order to convict Campbell of unlawful manufacture of methamphetamine, the State was required to prove that he manufactured the controlled substance known as methamphetamine. See PIK Crim. 3d 67.21. As is clearly shown, the elements of the crimes are different and, under our current test, multiplicity does not exist.

Additionally, we cannot find any evidence or argument to support Campbell's contention that possession of ephedrine is a lesser included crime of manufacture of methamphetamine. The legislature clearly provided for the criminalization of two different and distinct acts. The crimes have different aims and different prerequisite intents.

In addition, as the State argued, the crime of ephedrine possession is completed long before the crime of manufacturing a controlled substance such as methamphetamine is finalized. Finally, under our facts, there was a considerable amount of pseudoephedrine in Campbell's possession that had not been utilized in the ongoing manufacture of the prohibited controlled substance. Campbell's multiplicity argument is not persuasive.

*Sentence under K.S.A. 65-7006*

The final issue we face is Campbell's contention that he was illegally sentenced to a drug severity level 1 felony in No. 01 CR 147 for his conviction of possession of ephedrine under K.S.A. 65-7006(a). This argument is based on another panel of this court's decision in *State v. Frazier*, 30 Kan. App. 2d 398, 42 P.3d 188, *rev. denied* 274 Kan. 1115 (2002), which held that because the statute

prohibiting possession of drug paraphernalia, K.S.A. 2001 Supp. 65-4152(a)(3), a drug severity level 4 felony, had identical elements to the crime of possession of ephedrine under K.S.A. 2001 Supp. 65-7006(a), a defendant convicted of either crime may be sentenced only under the lesser penalty provision. Under our facts, the lesser penalty would be a drug severity level 4 felony and that would require Campbell to be resentenced on his possession of ephedrine conviction.

The State makes a compelling argument that *Frazier* was wrongly decided, in that the legislative intent was not followed, that 65-7006 is the more specific statute, and that the elements of the two crimes are in fact different. In addition, since *Frazier* was announced, we considered in *Wilson v. State*, 31 Kan. App. 2d 728, 71 P.3d 1180 (2003), whether to apply the *Frazier* decision retroactively, and we declined to do so. Judge Knudson's concurring opinion in *Wilson* expressed dissatisfaction with the *Frazier* result and suggested it was wrongly decided. Judge Knudson's concurrence suggested the initial sentence imposed by the trial court in *Frazier* was not an illegal sentence, that K.S.A. 65-4152(a)(3) and K.S.A. 1999 Supp. 65-7006(a) were not identical offenses, and the extension of the holdings of *State v. Nunn*, 244 Kan. 207, 768 P.2d 268 (1989), and *State v. Clements*, 241 Kan. 77, 734 P.2d 1096 (1987), to the circumstances of *Frazier* was unwarranted. 31 Kan. App. 2d at 734-36.

For the above stated reasons, we will separately consider whether Campbell was properly sentenced. This involves the interpretation of statutes under which our appellate review is unlimited. *State v. Maass*, 275 Kan. 328, 330, 64 P.3d 382 (2003). In doing so, we must follow the rules of statutory construction which require us to interpret a statute to give the effect intended by the legislature. *Williamson v. City of Hays*, 275 Kan. 300, 305, 64 P.3d 364 (2003). Ordinary words are to be given ordinary meaning, and a statute should not be so read as to add that which is not readily found therein or to read out what as a matter of ordinary English is in it, *Director of Taxation v. Kansas Krude Oil Reclaiming Co.*, 236 Kan. 450, 455, 691 P.2d 1303 (1984), and we must read the

statutes so as to give effect to every part thereof. *KPERS v. Reimer & Koger Assocs., Inc.*, 262 Kan. 634, 643-44, 941 P.2d 1321 (1997).

In this case because there is a clear difference of opinion as to which statute generally deals with the issue and which deals with a certain phase, the holding of *State v. Reed*, 254 Kan. 52, Syl. ¶ 1, 865 P.2d 191 (1993), is applicable and states: "When there is a conflict between a statute dealing generally with a subject and another statute dealing specifically with a certain phase of it, the specific statute controls unless the legislature intended to make the general act controlling."

The issue we face requires us to construe the specific language of two statutes. It is helpful to look to the legislative history and language of each. K.S.A. 65-4152 was first enacted in 1981 but substantially amended in 1996, see L. 1996, ch. 257, sec. 3, to state:

"K.S.A. 65-4152 is hereby amended to read as follows: 65-4152. (a) No person shall use or possess with intent to use:

"(1) Any simulated controlled substance;

"(2) any drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, *use*, store, contain, conceal, inject, ingest, inhale or otherwise introduce into the human body a controlled substance in violation of the uniform controlled substances act; *or*

"(3) *any drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, sell or distribute a controlled substance in violation of the uniform controlled substances act.*

"(b) Violation of ~~this section~~ *subsections (a)(1) or (2)* is a class A *nonperson* misdemeanor.

"(c) *Violation of subsection (a)(3) other than as described in paragraph (d) is a drug severity level 4 felony.*

"(d) *Violation of subsection (a)(3) which involves the possession of drug paraphernalia for the planting, propagation, growing or harvesting of less than five marijuana plants is a class A nonperson misdemeanor.*"

The 1999 Kansas Legislature further amended K.S.A. 65-4152 by adding (a)(4) prohibiting use or intent to use "anhydrous ammonia for the illegal production of controlled substance in a container not approved for that chemical by the Kansas department of agriculture." L. 1999, ch. 170, sec. 4. The remaining provisions

were unchanged except violation of the new subsection (a)(4) was made a drug severity level 4 felony.

The 1999 Kansas Legislature, by this same chapter 170, enacted new section 12 which became K.S.A. 65-7006 and states:

"New Sec. 12. (a) It shall be unlawful for any person to possess ephedrine, pseudoephedrine or phenylpropanolamine, or their salts, isomers or salts of isomers with intent to use the product as a precursor to any illegal substance.

"(b) It shall be unlawful for any person to market, sell, distribute, advertise, or label any drug product containing ephedrine, pseudoephedrine or phenylpropanolamine, or their salts, isomers or salts of isomers if the person knows or reasonably should know that the purchaser will use the product as a precursor to any illegal substance.

"(c) It shall be unlawful for any person to market, sell, distribute, advertise or label any drug product containing ephedrine, pseudoephedrine, or phenylpropanolamine, or their salts, isomers or salts of isomers for indication of stimulation, mental alertness, weight loss, appetite control, energy or other indications not approved pursuant to the pertinent federal over-the-counter drug final monograph or tentative final monograph or approved new drug application.

"(d) A violation of this section shall be a drug severity level 1 felony." L. 1999, ch. 170, sec. 12.

When one looks to the lengthy definition of "drug paraphernalia" found in K.S.A. 65-4150(c) which is broadly stated as including "products and materials" but in the main describes physical objects or tools used in the manufacture of controlled substances it becomes apparent that K.S.A. 65-7006 was intended to criminalize the possession and uses of specific substances (such as ephedrine) which are used as a precursor to any illegal substance. As such, it becomes the more specific statute and subject to our legal maxim previously set forth that a specific statute controls over the more general act such as K.S.A. 65-4152. This conclusion supports the usage of the penalty provision of K.S.A. 65-7006, making the violation in our case a drug severity level 1 felony.

Although action by the 2002 Kansas Legislature postdates the time of the case we are considering, in making our construction of the statutes before us, we note that both were amended. See L. 2002, ch. 155, secs. 3 and 4. The language of K.S.A. 65-4152(a)(4) relating to anhydrous ammonia was slightly changed in a manner not significant to our facts. However, the amendments to K.S.A.

65-7006, which do not apply substantively to our facts, added *"red phosphorus, lithium metal, sodium metal, iodine, anhydrous ammonia, pressurized ammonia"* as specific substances whose possession and usage to manufacture a controlled substance were criminalized and whose penalty for violation of this section is a drug severity level 1 felony.

The minutes of the Senate Judiciary Committee, dated March 18, 2002, in consideration of H.B. 2075, include letters from deputy district attorneys in Reno and Sedgwick Counties urging the drug severity level 1 felony penalties be continued in 65-7006 because of the great increase in methamphetamine cases. The letters requested that additional substances be designated in 65-7006 and expansion of the definition of manufacture. The committee minutes reflect the amendment of the bill to go back to and continue the original sentencing where the violation would be a drug severity level 1 felony. It is clear that reducing the severity level was considered, rejected, and the legislative intent is to penalize the possession and intended illegal usage of the named substances as drug severity level 1 felonies. The Kansas Legislature believed the State had or has a serious methamphetamine problem. A construction of K.S.A. 65-7006 that would result in a lesser severity level offense would be contrary to the existing legislative intent.

We understand the valid argument of *Frazier* that the generic language of "products and materials" of K.S.A. 65-4152 may include the named substances set forth in K.S.A. 65-7006, but it is also equally logical to look to one statute as generally relating to tools or equipment necessary for manufacturing controlled substances and the other to more specifically cover the precursors to methamphetamine and, thus, find the elements do in fact differ. We agree with the language of Judge Knudson's concurring opinion in *Wilson*, where he said:

"Secondly, K.S.A. 65-4152(a)(3) and K.S.A. 1999 Supp. 65-7006(a) are not identical offenses. As correctly noted by the *Frazier* panel, the statutes use different language to describe the respective offenses. Notwithstanding, the panel then proceeds to conclude this is a distinction without a difference as both prohibit the same identical conduct. The difficulty is that both statutes do not prohibit the same identical conduct. K.S.A. 1999 Supp. 65-7006(a) prohibits possession of

drugs used to make methamphetamine. K.S.A. 65-4152(a)(3) prohibits possession of drug paraphernalia. To conclude that the offenses are identical required the *Frazier* panel to construct an interpolation inconsistent with the logic and expressed reasoning in *Nunn* and *Clements*." *Wilson,* 31 Kan. App. 2d at 735.

We also agree with the *Wilson* concurring opinion that any sentence imposed under K.S.A. 65-7006 is not illegal. It was a valid sentence under a valid statute.

Finally, we agree with the State's argument that "[t]he legislature's exclusive role in providing, through our statutes, for the punishment of convicted criminals is clear." *State v. Reed,* 248 Kan. 792, Syl. ¶ 7, 811 P.2d 1163 (1991). We hold the clear legislative intent in K.S.A. 65-7006 was to criminalize the specific items found in Campbell's possession and with his clearly shown usage a drug severity level 1 felony resulted. He was correctly sentenced.

We decline to follow *Frazier* and respectfully suggest it was wrongfully decided.

Affirmed.