NOT DESIGNATED FOR PUBLICATION

No. 120,334

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

LINUS BAKER,
*Appellant*,

v.

CALVIN HAYDEN, et al., and KATHERINE STOCKS, in Her Capacity
as Official Custodian of Records for the Tenth Judicial District,
*Appellees*.


MEMORANDUM OPINION

Appeal from Johnson District Court; ROBERT W. FAIRCHILD, judge. Opinion filed March 20, 2020. Affirmed in part, reversed in part, and remanded with directions.

*Linus Baker*, appellant pro se.

*Kirk T. Ridgway* and *Brett T. Runyon*, of Ferree, Bunn, Rundberg & Ridgway, Chtd., of Overland Park, for appellees.


Before ATCHESON, P.J., HILL and BUSER, JJ.


ATCHESON, J.: In this civil action, Plaintiff Linus Baker appeals the summary judgment the Johnson County District Court entered against him on claims that law enforcement officers with the Johnson County Sheriff's Department violated his constitutional rights and committed common-law torts against him and that a representative of the sheriff's department later failed to comply with the Kansas Open Records Act in responding to a request for documents concerning the circumstances giving rise to those claims. We find Baker has failed to present colorable evidence supporting actionable constitutional or tort injuries and affirm that part of the district

1

court's decision. We find the district court impermissibly granted summary judgment on Baker's open records requests and remand for further proceedings on them.

After outlining the standards for granting and reviewing summary judgment, we take up Baker's claims based on the alleged constitutional and common-law torts and then consider the open records dispute.

*Summary Judgment Standards*

The standards governing summary judgment guide how we consider competing versions of the relevant facts. The defendants, as the parties seeking summary judgment, had the obligation to show the district court, based on appropriate evidentiary materials, there were no disputed issues of material fact and judgment could, therefore, be entered in their favor as a matter of law. *Trear v. Chamberlain*, 308 Kan. 932, 935, 425 P.3d 297 (2018); *Shamberg, Johnson & Bergman, Chtd. v. Oliver*, 289 Kan. 891, 900, 220 P.3d 333 (2009). In essence, they argued there was nothing for a jury or a district court judge sitting as fact-finder to decide that would make any difference. In opposing summary judgment, Baker had to cite record evidence calling into question a material factual representation defendants made in support of their motion. See *Trear*, 308 Kan. at 935-36; *Shamberg*, 289 Kan. at 900. When a party has identified disputed material facts, the motion should be denied in favor of a trial to permit a judge or jury to resolve those disputes after hearing witnesses testify in court and reviewing any relevant documentary evidence.

In addressing a request for summary judgment, the district court must view the evidence most favorably to the party opposing the motion and give that party the benefit of every reasonable inference that might be drawn from the evidentiary record. *Trear*, 308 Kan. at 935; *Shamberg*, 289 Kan. at 900. An appellate court applies the same standards in reviewing the entry of a summary judgment. Because a summary judgment presents a question of law—it entails the application of legal principles to uncontroverted

2

facts—an appellate court owes no deference to the district court's decision to grant the motion, and review is unlimited. See *Adams v. Board of Sedgwick County Comm'rs*, 289 Kan. 577, 584, 214 P.3d 1173 (2009).

*Baker's Constitutional and Common-law Claims*

   *A. Factual Circumstances*

Baker's constitutional and common-law tort claims stem from efforts of Johnson County Sheriff's officers to serve a petition for protection from abuse and a related temporary order. On September 1, 2015, Ryan McCormick, then Baker's son-in-law, filed a petition for protection from abuse in Wyandotte County District Court against his wife (and Baker's daughter) Maggie and immediately obtained a temporary order from that district court. The order generally identifies Maggie and gives her residential address as Baker's home in Stilwell. The order requires Maggie to stay away from Ryan and to refrain from contacting or communicating with him. In addition, the order grants Ryan "[t]emporary legal custody and residency" of S.F.M., his and Maggie's 10-month-old son, at least in advance of a hearing set in Wyandotte County District Court about two weeks later. The order neither indicates S.F.M.'s presumed whereabouts nor expressly directs Maggie to relinquish physical custody of the child. And the order contains no identifying information about S.F.M. apart from his name.

The day after obtaining the temporary order, Ryan contacted the Johnson County Sheriff's Department for assistance in serving the petition and order on Maggie and for a "stand-by" presence so he could return some personal property to her. Ryan and his mother initially met with Deputy Travis Turner shortly after 6 p.m. Turner was uncertain about the scope of his duties and authority in serving the order, particularly with respect to S.F.M. After speaking with two colleagues, Turner drove to Baker's home, followed by Ryan and his mother. Lieutenant Thomas Reddin and Sergeant Christopher Mills also arrived at the residence.

3

The three officers, all in uniform, walked up the driveway, where Baker met them. Turner explained they had an order to take custody of S.F.M. and deliver him to his father. Baker told the officers to leave. There was some more verbal back-and-forth. Baker again directed the officers to get off his property—a direction they informed him they would decline, prompting him to suggest they needed a search warrant. As Baker walked up the driveway toward the house, Mills saw C.B., Baker's three-year-old granddaughter. Mills crouched down and asked C.B. if she were S.F.M. The child seemed to nod reticently. Mills then picked up C.B. and began walking down the driveway toward Ryan's car. Baker turned around. As he approached Mills, Turner shouted, "Hey" as an admonition to stop. At the same time, Reddin moved between Baker and Mills. Reddin held up his hand and momentarily placed his hand on Baker's arm. Baker hesitated briefly and then marched down the driveway shouting for the officers to leave and telling them that C.B. was not S.F.M. C.B. appeared to be crying.

Baker continued to demand the officers return C.B. and leave his property. When Ryan saw C.B., he informed Mills that the child was not S.F.M. Mills immediately returned to the mouth of the driveway, where he met Baker and relinquished a visibly upset C.B. Mills had physical custody of C.B. for between 30 and 45 seconds. Baker again told the officers to leave and got into another verbal back-and-forth with Mills about who was out of line. Baker picked up C.B. and walked into the house through the open garage.

Mills called a sheriff's lieutenant who handled civil process to determine what they should do next. The lieutenant advised them to try calling Maggie and if they got no response to leave the premises. The officers then spoke with Ryan and attempted to call Maggie with no success. Ryan, his mother, and the officers then left. In all, the officers were at Baker's house for about 10 minutes. The verbal jousting between Baker and the three officers was conducted with stern and sometimes raised voices all the way around, punctuated with some literal finger pointing.

The next day, Johnson County Sheriff's Deputy Brian Deer, Deputy Carl Alvano, and Deputy Blake Randel went to Baker's home to serve the temporary order on Maggie. They went up the driveway. As one officer knocked on the door and rang the bell, a second officer looked into the garage and through several windows into the residence. The last officer stood in the driveway and briefly approached the open garage. He and the first officer then walked to the side of the garage where they could look into the backyard. No one answered the door or otherwise communicated with the officers.

As the officers were leaving, a car pulled into the driveway. The officers approached, and the driver identified himself as Baker's son. He told the officers he did not know if Maggie was living there. A passenger in the car stated that Baker had instructed them not to talk to the officers. Baker's son then backed his car out and drove away. The officers immediately left the area. They had been at Baker's house less than 10 minutes.

*B. Legal Analysis*

Baker sued Turner, Mills, and Reddin for their conduct at his residence on September 2 and Deer, Alvano, and Randel for their conduct on September 3. Baker's petition tends to meander to no good effect—it contains 275 paragraphs covering 52 pages and is anything but a "short and plain statement" of the claims and requested relief as contemplated in K.S.A. 2019 Supp. 60-208(a)(1). The parties undertook what appears to be extensive discovery. And the summary judgment papers are lengthy. The district court ultimately granted summary judgment to all six officers on all of Baker's claims against them.

The district court wound up addressing the issues in four memorandum decisions serially filed between March and November 2018, as the parties presented competing

5

motions for reconsideration. The district court modified its analysis of some of the points over the course of those rulings.

Baker's appellate brief shares certain compositional attributes with his petition. The brief is long on rhetoric about the dangers of government overreach and an incipient police state but considerably shorter on focused arguments tied to precise claims and supporting legal authority. We break out each claim Baker asserted in the district court and continues to press on appeal and explain why we affirm summary judgment on that claim.

• Baker claimed a violation of his right to be free of unreasonable government searches and seizures as protected in the Fourth Amendment to the United States Constitution. He contends the conduct of the officers appearing the evening of September 2 and the officers coming back the next day interfered with a constitutionally protected privacy interest in the residence.

The Fourth Amendment protects an expectation of privacy in one's home and its curtilage. See *Collins v. Virginia*, 584 U.S. ___, 138 S. Ct. 1663, 1670, 201 L. Ed. 2d 9 (2018). Although the Fourth Amendment applies most robustly to dwellings, even there the constitutional shield is not absolute and yields to reasonable government intrusions. See *Florida v. Jardines*, 569 U.S. 1, 6, 133 S. Ct. 1409, 185 L. Ed. 2d 495 (2013) ("At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'") (quoting *Silverman v. United States*, 365 U.S. 505, 511, 81 S. Ct. 679, 5 L. Ed. 2d 734 [1961]); *Kyllo v. United States*, 533 U.S. 27, 34, 121 S. Ct. 2038, 150 L. Ed. 2d 94 (2001) (Fourth Amendment protects "an expectation of privacy that society is prepared to accept as reasonable" and is particularly exacting with respect to "the interior of homes"). Government agents, including law enforcement officers, may enter residential property in the same way a private citizen could (typically by going up a driveway or front walk) to knock on the front door and speak to whoever answers—all without transgressing the Fourth

Amendment. See *Kentucky v. King*, 563 U.S. 452, 469-70, 131 S. Ct. 1849, 179 L. Ed. 2d 865 (2011); *State v. Campbell*, 297 Kan. 273, Syl. ¶ 5, 300 P.3d 72 (2013).

In addition, the officers here had a limited license or privilege to enter Baker's property to serve Maggie with the petition for protection from abuse and to execute the temporary order from the Wyandotte County District Court. As provided in K.S.A. 2019 Supp. 60-3104(d), the petition required "personal service" on Maggie, meaning it had to be presented directly to her and could not simply be left with another adult with whom she resided. K.S.A. 2019 Supp. 60-303(d)(1)(A); see *In re J.A.*, 30 Kan. App. 2d 416, Syl. ¶ 4, 42 P.3d 215 (2002). The order provided Baker's address as the place Maggie could be found. Although the order was legally effective when the Wyandotte County District Court signed and filed it and law enforcement officers could then enforce the order's terms by, for example, removing Maggie from the family residence, Maggie would not have been subject to specific sanctions, such as contempt or criminal prosecution, for violating the order unless she had received actual notice of its terms. See K.S.A. 2019 Supp. 21-5924(a)(1) (criminalizing knowing violation of protection from abuse order); *Ensch v. Ensch*, 157 Kan. 107, 115-16, 138 P.2d 491 (1943) (party may not be held in contempt of order that fails to define with particularity what is to be done or what is forbidden); 25 Am. Jur. 2d, Domestic Abuse and Violence § 55. The officers, therefore, had a legitimate reason to deliver the petition and order to her personally.

Instructive here, the Kansas Supreme Court has recognized and relied on the principles governing privilege attaching to the service of civil process outlined in the Restatement (Second) of Torts § 208 (1965). *State v. Reno*, 260 Kan. 117, 127-28, 918 P.2d 1235 (1996). The Kansas appellate courts often turn to the Restatement (Second) of Torts as a sound source of legal doctrine. See *Williams v. C-U-Out Bail Bonds*, 310 Kan. 775, 789-91, 450 P.3d 330, 340-42 (2019) (citing and noting past reliance on Restatement); *McElhaney v. Thomas*, 307 Kan. 45, 55, 405 P.3d 1214 (2017) ("adopt[ing] . . . as our own" Restatement principles outlining requisite mental state for intentional torts).

7

The privilege defined in Restatement (Second) of Torts § 208 permits a person to enter the land of another to execute valid or facially legitimate civil process on an occupant of the land but prohibits a forcible entry of a dwelling to do so. In the commentary to that section, the Restatement authors point out that the manner of execution must be reasonable—so coming on the property in the dark of night or with a swarm of agents would not be privileged. And a person making a privileged entry may be liable for his or her independently tortious conduct once there. Restatement (Second) of Torts § 208, comment b (citing Restatement [Second] of Torts § 214); comment c.

The Kansas appellate courts have not discussed a cognate privilege recognized in Restatement (Second) of Torts § 210 pertaining to the service of a court order. The privilege is roughly comparable to the one for service of process but permits the forcible entry of buildings if reasonably necessary to effect the court order.

To resolve this case, we need not and do not attempt to sketch the outer limits of the common-law privilege in Kansas attaching to the service of civil process or the execution of civil orders. Nor do we consider whether the privileges might have different contours for commissioned law enforcement officers acting under the color of state law, on the one hand, and for private process servers, on the other.

Taking the evidence in the best light for Baker, the Johnson County Sheriff's officers acted within the boundaries of Restatement (Second) of Torts § 208 on both September 2 and September 3. In each instance, the officers had valid civil process and a court order directed at Maggie, and they had good reason to believe she resided at Baker's home. They entered the property to serve the petition and to execute the order and accomplished their entry during what would be considered appropriate hours without some overt display of weaponry or martial force. In neither instance did the officers attempt to enter Baker's house, forcibly or otherwise. And they did not come on the property by scaling a privacy fence or forcing their way through a locked gate.

8

Baker's oral directives on September 2 that the officers leave the property did not undo the privilege recognized in *Reno* and outlined in Restatement (Second) of Torts § 208. The officers were permitted to attempt service of the petition and order on Maggie at least by going to the front door and trying to summon her. On neither day did the officers linger excessively on Baker's property. Camping out on private property, especially in the face of a directive to leave, presumably would lose any common-law privilege after a "reasonable" time.

When the officers confronted Baker, they stated their purpose as executing an order to deliver S.F.M. to his father. They did not mention serving Maggie with any legal papers. Mills, then, picked up C.B. and briefly removed her to the end of the driveway, presumably effecting a Fourth Amendment seizure of her. Those circumstances, however, do not negate the officers' privilege to enter and remain on the property to serve process and execute the order. As we discuss, the officers did not violate Baker's Fourth Amendment rights.

To the extent the officers' conduct in entering and remaining on Baker's property was privileged consistent with *Reno* and Restatement (Second) of Torts § 208, it was likewise reasonable under the Fourth Amendment and did not amount to a breach of Baker's privacy rights encompassed within the Fourth Amendment. The courts have recognized that government agents typically do not violate the Fourth Amendment if they intrude on or seize private property in a reasonable manner to effect service of civil process or the execution of civil orders. See *Soldal v. Cook County*, 506 U.S. 56, 71, 113 S. Ct. 538, 121 L. Ed. 2d 450 (1992) (If officers were repossessing or attaching property "pursuant to a court order . . . a showing of unreasonableness [under the Fourth Amendment] would be a laborious task indeed."); *Widgren v. Maple Grove Tp.*, 429 F.3d 575, 580 (6th Cir. 2005) (no Fourth Amendment violation when municipal zoning inspector posted civil infraction notice on front door of house bypassing metal gate and no trespassing signs at mouth of driveway); *United States v. Raines*, 243 F.3d 419, 421

9

(8th Cir. 2001) (no Fourth Amendment violation when officer entered backyard of residence in effort to serve civil process on person believed to be living there).

In this case, Baker has brought a civil claim under 42 U.S.C. § 1983 for damages resulting from the conduct of the sheriff's officers, as government agents acting under the color of state law, that allegedly violated his constitutional rights. In assessing a constitutional injury based on a Fourth Amendment violation, the courts look at the objective reasonableness of the government agents' conduct and not the subjective intent behind their actions. *Devenpeck v. Alford*, 543 U.S. 146, 153-54, 125 S. Ct. 588, 160 L. Ed. 2d 537 (2004); *Brooks v. City of Winston-Salem, N.C.*, 85 F.3d 178, 184 n.5 (4th Cir. 1996). That is, would the hypothetical reasonable law enforcement officer have done what the officers did? If so, there would be no constitutional injury, since the Fourth Amendment prohibits *unreasonable* searches and seizures and concomitant invasions of privacy. The objective reasonableness inquiry to the exclusion of subjective motivation aims to secure consistency across cases, so officers may not escape liability for unreasonable actions undertaken with subjective good faith or honesty of purpose. *Devenpeck*, 543 U.S. at 153-54 (law enforcement officer's state of mind irrelevant to constitutional propriety of Fourth Amendment seizure; contrary rule would recognize or reject constitutional violations arising from indistinguishable external factual circumstances based solely on subjective intent).

So even if officers were motivated exclusively by an intent to take custody of S.F.M., their conduct with respect to Baker and his Fourth Amendment rights in entering and remaining on the property was consistent with a reasonable effort to serve process and the temporary order on Maggie. That objective reasonableness undercuts Baker's claim the officers violated the Fourth Amendment by exercising some impermissible dominion over his property, even though they left without any further effort to find and serve Maggie after mistakenly picking up C.B.

10

The officers did not invade Baker's constitutionally protected privacy rights on September 2, since they remained on the driveway, an unrestricted area to which the public generally had access and likely would use to reach the front door to deliver packages, solicit charitable contributions, or borrow a cup of sugar. Similarly, the officers did not impermissibly deprive Baker of the use of his residence, especially given the brevity of their limited physical intrusion.

The officers who appeared at Baker's residence the next day to serve the petition and order on Maggie did not exceed the reasonableness of the Fourth Amendment. They came to the front door, rang the bell or knocked, and briefly looked in a front window and the backyard when no one responded, despite the presence of motor vehicles in the driveway. But they did not attempt to enter the house, the garage, or the backyard. The officers remained only briefly, including the time they spent talking to Baker's son after he drove up.

Even if we were mistaken in finding no Fourth Amendment violations and the officers actually made a constitutionally impermissible search or seizure of Baker's property, they would, nonetheless, be entitled to qualified immunity on the claim. The district court granted summary judgment to them on that basis. Qualified immunity is a judicially recognized doctrine affording government agents a limited protection against claims for damages resulting from alleged violations of the United States Constitution or other federal law. The immunity applies in § 1983 actions unless the government agents have violated "a federal statutory or constitutional right" and the wrongfulness of their conduct was "'clearly established at the time'" they acted. *District of Columbia v. Wesby*, 583 U.S. ___, 138 S. Ct. 577, 589, 199 L. Ed. 2d 453 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664, 132 S. Ct. 2088, 182 L. Ed. 2d 985 [2012]). As a matter of public policy, judicial recognition of qualified immunity ostensibly encourages government officials and employees to act vigorously in performing their duties free from a fear they will be heavily burdened by insubstantial or harassing civil suits challenging

11

those actions as violations of federal law. See *Harlow v. Fitzgerald*, 457 U.S. 800, 814, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982).

In the factual circumstances here, we, of course, have concluded the officers did not violate the Fourth Amendment at all, since they entered and remained briefly on Baker's property to serve a protection from abuse petition and to execute a related court order. A fortiori, we are not prepared to say the officers acted in a way that clearly violated Baker's established Fourth Amendment rights with respect to the property. But if we have erred in the first conclusion, the second holds in the absence of clearly established contrary case authority. We have been apprised of none. Moreover, court papers, particularly orders, issued in protection from abuse actions have a public welfare overlay that sets them apart from process and even judgments in more distinctly private disputes arising from breached contracts or negligently inflicted injuries. See K.S.A. 60-3101(b) (Kansas Protection from Abuse Act "shall be liberally constructed to promote the protection of victims of domestic violence . . . and to facilitate access to judicial protection for the victims"). Accordingly, the officers did not violate some clearly established constitutional protection in the manner they attempted to effect service of the protection from abuse petition and execution of the temporary order.[1]

[1]In his petition, Baker brought claims under § 1983 alleging constitutionally deficient training and policies and practices of the Johnson County Sheriff's Department. Those claims lie against a municipal or local governmental entity legally responsible for the training and policies and practices. See *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). In Kansas, county sheriffs are locally elected officials, and their budgets are approved by county commissions. But some of their duties have been viewed as integral to statewide law enforcement. As a result, the courts have been less than monolithic in whether a sheriff's department functions as part of the county government and, thus, a municipality or as an arm of the State for purposes of *Monell* claims. See *Arnold v. City of Olathe*, 413 F. Supp. 3d 1087, 1109 (D. Kan. 2019) (recognizing division of authority and finding county sheriff to be agent of State entitled to immunity under Eleventh Amendment to the United States Constitution); contra *Estate of Holmes v. Somers*, 387 F. Supp. 3d 1233, 1257-61 (D. Kan. 2019) (recognizing authority and finding county sheriff to be agent of county, a municipality under *Monell*, and therefore, without Eleventh Amendment immunity). The uncertainty is not simply academic and affects the available defenses.

12

Either way, however, qualified immunity granted to individual officers for § 1983 claims against them is not a pass-through defense that derivatively shields their employers from *Monell* claims. *Owen v. City of Independence*, 445 U.S. 622, 650, 100 S. Ct. 1398, 63 L. Ed. 2d 673 (1980); *Barna v. Board of School Directors of Panther Valley School District*, 877 F.3d 136, 145 & n.6 (3d Cir. 2017).

As we read the record, Baker voluntarily withdrew his *Monell* claims. We rely principally on a terse reference in the district court's order entered March 18, 2018, to Baker dismissing the Johnson County commissioners as defendants. The district court otherwise referred to *Monell* claims in its May 23 order that reversed the dismissal of some of Baker's other § 1983 claims. The district court concluded Baker could "proceed on his civil rights (*Monell*) claim," a reference we take to be a generic characterization of the alleged constitutional wrongs. The district court then reversed itself in an August 24 decision and held the defendants were entitled to summary judgment. That decision discussed the constitutional claims generally and did not distinguish between those brought against the individual officers and the *Monell* claims. The ruling, therefore, presumably granted summary judgment to the defendants on all of the remaining claims. In its final order filed November 15, the district court simply denied Baker's request for reconsideration of the August 24 order.

If the *Monell* claims were not dismissed either voluntarily or by court order, we do not have a final appealable judgment in front of us. See *Wilkinson v. Shoney's, Inc.*, 265 Kan. 141, Syl. ¶ 4, 958 P.2d 1157 (1998); *Ball v. Credit Bureau Services, Inc.*, No. 111,144, 2015 WL 4366440, at *13 (Kan. App. 2015) (unpublished opinion). None of the parties suggests that to be true. Baker has presented no arguments on appeal regarding the *Monell* claims. We, therefore, do not consider them. We may fairly construe the district court's orders collectively as denying relief to Baker on all of his claims. We do so and presume the appeal to be proper.

• Baker claims the sheriff's deputies seized him on September 2 in violation of his Fourth Amendment rights. He identifies what he considers two unconstitutional seizures. First, Mills' decision to pick up C.B. and walk down the driveway with her effectively "froze" Baker, so that he could not go into his house or otherwise move away from the immediate area. And second, Reddin effected a seizure by placing his hand on Baker's upper arm as Mills carried C.B. toward the street. We find neither alone to be a Fourth Amendment violation. Nor are they if considered in tandem.

Because the Fourth Amendment prohibits unreasonable searches and seizures, some conduct of government agents may be so brief or unobtrusive that it cannot be considered unreasonable in a constitutional sense. See *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989) (not every push or shove amounts to an unconstitutional use of force effecting a seizure); *Pennsylvania v. Mimms*, 434 U.S. 106, 111, 98 S. Ct. 330, 54 L. Ed 2d 331 (1977) (asking driver stopped for traffic violation to step out of vehicle is itself an "additional intrusion [that] can only be described as *de minimis*" for Fourth Amendment purposes). In those situations, the intrusion is treated as so minor that it causes no Fourth Amendment violation. The person intruded upon, thus, suffers no constitutional injury.

We need not and do not endeavor to define the metes and bounds of actionable Fourth Amendment violations in addressing Baker's claims. But we comfortably conclude that the evidence taken in its best light for those claims fails to show an unconstitutional seizure of Baker. Mills had physical custody of C.B. for between 30 and 45 seconds. Assuming Baker actually were detained as a result, the duration of the detention was remarkably brief. The place of detention was his own driveway in the early evening. And the manner entailed no particular, let alone painful, physical restraints. Baker's Fourth Amendment rights were not violated.

Reddin did not apply any demonstrable physical force to Baker. Rather, he touched Baker's upper arm in what looks to be a nonverbal signal indicating to Baker that he should not follow Mills. As the video shows, Baker essentially disregarded Reddin and did walk down the driveway after Mills without being physically restrained. Again, under those circumstances, Baker cannot establish that he was unreasonably seized in violation of the Fourth Amendment. On this claim, we have not considered qualified immunity as an alternative ground for granting summary judgment, since the absence of a constitutional violation seems clear.

14

Whether the officers violated C.B.'s Fourth Amendment rights on September 2 when she was seized and carried down the driveway is an entirely different question and one that is not before us. The officers' treatment of C.B. was markedly more intrusive than their physical contact with Baker. And, as we have mentioned, the temporary order is elliptical about effecting the custody arrangements it directs for S.F.M., calling into question the officers' decision to make a physical seizure at all. The parties have informed us that C.B. has filed her own § 1983 action in federal district court alleging she was unconstitutionally seized. See *C.F.B. v. Hayden*, No. 16-2645-CM, 2019 WL 1299679 (D. Kan. 2019) (unpublished opinion) (granting in part and denying in part defendants' motion for summary judgment). We express no opinion about that claim except to say that a violation of C.B.'s Fourth Amendment rights would not automatically violate Baker's rights.

• Baker claims Mills' actions in taking physical custody of C.B. interfered with a constitutionally protected associational right he had with her as her grandfather. The United States Supreme Court has suggested grandparents and grandchildren have a familial relationship commanding constitutional recognition. See *Overton v. Bazzetta*, 539 U.S. 126, 131, 123 S. Ct. 2162, 156 L. Ed. 2d 162 (2003); see also *United States v. White*, 782 F.3d 1118, 1139-40 (10th Cir. 2015) (recognizing associational right of some constitutional dimension between grandparent and grandchild); *Johnson v. City of Cincinnati*, 310 F.3d 484, 501 (6th Cir. 2002) (recognizing associational right between grandparent and grandchild). For purposes of this claim, we presume Baker and C.B. have interlocking constitutionally protected associational rights as grandparent and grandchild, presumably grounded in the First Amendment to the United States Constitution or in a substantive due process right in the Fourteenth Amendment.

But not every intrusion on that right creates a constitutional injury. See *White*, 782 F.3d at 1140. The evidence taken most favorably to Baker does not depict an actionable interference in his constitutionally protected associational right with C.B. The officers physically separated Baker from C.B. for a little more than 30 seconds. And although the

15

child was upset and Baker angered, their relationship suffered no actionable constitutional rift or impairment given the brevity of the separation. Without belaboring our analysis, the officers would be entitled to qualified immunity on this claim even if we are mistaken in finding no constitutional injury. No authority we are aware of would have supported the idea that in 2015 taking custody of a child for less than a minute to determine if he or she were the subject of a court order would have violated the constitutionally protected associational rights of the child's grandparents.

• Baker has alleged that on September 2 the officers committed a common-law civil assault against him. A civil assault entails the threat of bodily harm coupled with the apparent ability to carry out the threat resulting in the victim's immediate apprehension of harm. *Baska v. Scherzer*, 283 Kan. 750, 756, 156 P.3d 617 (2007); *Estate of Randolph v. City of Wichita*, No. 118,842, 2020 WL 288978, Syl. ¶ 9 (Kan. App. 2020). The actionable injury is the victim's apprehension and, thus, his or her mental disturbance resulting from the threat. 2020 WL 288978, Syl. ¶ 9; see 6 Am. Jur. 2d, Assault and Battery § 88; Prosser and Keeton, Law of Torts § 10 (5th ed. 1984).

On appeal, Baker does not identify what conduct of the officers purportedly amounted to a threat of physical harm to him. We are neither obligated nor really supposed to pick through the record to find facts that might support a claim, even on behalf of a party resisting a motion for summary judgment. By failing to cite specific facts, a party effectively outsources his or her job as an advocate to marshal favorable evidence to us as a reviewing court. We should not do so. That failure alone is sufficient to affirm the district court's decision to grant the defendants' summary judgment motion on the assault claim. See *Hill v. State*, 310 Kan. 490, Syl. ¶ 7, 448 P.3d 457 (2019).

But we have reviewed the parties' submissions to the district court, including the video recordings the officers made of their actions leading up to and upon entering Baker's property. Although the officers carry handguns, none of them—as shown in the videos—displays or otherwise threatens the use of the firearms or nonlethal weapons,

16

such as a Taser or baton. Likewise, they do not by word or conduct seem to convey a threat of bodily harm to Baker. In short, we can find no readily apparent factual basis either directly or inferentially supporting a civil assault.

• Baker has alleged the officers on September 2 committed a civil battery against him. Civil battery entails an unprivileged intentional touching with the purpose of bringing about a harmful or offensive contact. *Baska*, 283 Kan. at 756; *Estate of Randolph*, 2020 WL 288978, Syl. ¶ 10. The compensable harm derives from the nature and extent of the contact. 2020 WL 288978, Syl. ¶ 10; Prosser and Keeton, Law of Torts § 9 (5th ed. 1984). The wrongdoer may be held accountable if he or she has the intent to cause a physical injury or an otherwise offensive physical contact. *McElhaney*, 307 Kan. at 55-56. On appeal, Baker has failed to identify the conduct he contends supports a civil battery. As with the assault claim, the omission is itself fatal to the point on appeal.

Again, however, our review of the videos shows nothing that could be construed as a civil battery. The only physical contact between Baker and any of the officers occurred when Reddin momentarily touched Baker's upper arm. We have already described the circumstance—a reasonable juror could not find it was either harmful or offensive. The district court properly granted summary judgment on the battery claim.

• Baker has alleged he was falsely arrested or imprisoned on September 2 as the officers were on his property. False arrest and false imprisonment are synonymous terms for an intentional tort entailing one person's physical restraint of another person's movement or liberty without legal justification. See *Brown v. State*, 261 Kan. 6, 9, 927 P.2d 938 (1996). As we understand the claim, Baker relies on the same idea underlying the alleged Fourth Amendment violation: He was frozen or seized—he couldn't reasonably consider leaving the driveway—while Mills physically had custody of C.B. But the imposition on Baker lasted only during the time Mills had C.B. and, thus, was remarkably brief. Moreover, as we have mentioned, the officers did not impose any direct physical restraints on Baker or limit his movements other than to indicate he should not

follow Mills. And Baker essentially did so anyway. The facts, taken favorably to Baker, would not permit a jury to find in his favor on this claim.

• Baker has alleged the sheriff's deputies trespassed on his property on both September 2 and September 3. Under Kansas law, the intentional tort of trespass entails a person's entry onto "the premises of another without any right, lawful authority, or an express or implied invitation or license." *Armstrong v. Bromley Quarry & Asphalt, Inc.*, 305 Kan. 16, 22, 378 P.3d 1090 (2016). Concomitantly, a person who remains on another's premises after an invitation or license has been revoked becomes a trespasser. See *Riddle Quarries, Inc. v. Thompson*, 177 Kan. 307, 311, 279 P.2d 266 (1955); *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1262 (11th Cir. 2012) (Under the common law, one who remains on land against the owner's wishes becomes a trespasser.). We have, for the most part, already addressed this issue in analyzing Baker's Fourth Amendment claim based on the officers' presence on his property. We do not repeat that analysis here.

The officers had a privilege to attempt service of the protection from abuse petition and the temporary order on Maggie at the address listed for her in those papers—Baker's residence. As we have said, the privilege was a limited one, allowing the officers to go to the front door, to ring the door bell or to knock, and to briefly assess from that general vantage point whether anyone was inside. In doing so, they did not have a privilege to enter the home or to force their way through a locked gate or otherwise damage the premises. Conversely, Baker's oral directive that they leave did not override the limited privilege that derives from the officers' authority to serve the court papers rather than from any express grant of permission from Baker. The privilege shielded the attempts at service on both September 2 and September 3. Again, taking the evidence favorably to Baker, the district court properly granted summary judgment to the defendants.

18

Because Baker has not shown any actionable injury on the common-law claims he has asserted, we need not determine whether the defendants enjoyed some form of immunity under the Kansas Tort Claims Act (KTCA), K.S.A. 75-6101 et seq. Those statutory immunities cut off liability for what would otherwise be colorable tort claims and function as affirmative defenses. See *Estate of Randolph*, 2020 WL 288978, Syl. ¶ 3. When, as here, a plaintiff has failed to produce evidence of a legally cognizable harm, KTCA immunity would be no more than an alternative (and superfluous) basis for granting judgment to the defendant. We, therefore, do not consider KTCA immunity.

*Baker's Open Records Act Claims*

*A. Factual Circumstances*

Between September 11 and September 22, 2015, Baker sent a series of document requests under KORA to the Johnson County Sheriff's Department related to the officers entering his property earlier that month to serve the protection from abuse petition and to execute the temporary order. Those requests were made about 15 months before Baker filed this action. Baker communicated with the designated custodian of the departmental records about the requests. See K.S.A. 2019 Supp. 45-217(d) ("custodian" of records defined under KORA); K.S.A. 2019 Supp. 45-217(e) ("official custodian" of record defined under KORA). Baker then redefined at least one of the requests. The department agreed to and did produce some documents, including various reports and the officers' bodycam videos from September 2 and September 3. The department declined to produce certain records, citing KORA exemptions. Baker sought relief under KORA in this case. See K.S.A. 2019 Supp. 45-222 (party may bring civil action in district court to enforce disclosure provisions of KORA and to challenge government agency's claimed exemption).[2]

[2]In his petition, Baker made a separate KORA claim for judicial records—digital audio recordings of district court proceedings—and named an employee of the Tenth Judicial District as the defendant. The district court denied Baker relief on that claim and

19

certified its ruling as a final judgment under K.S.A. 2019 Supp. 60-254(b), since it presented a novel issue under KORA. Baker appealed, and another panel of this court reversed but found the legal controversy moot as to the particular records. *Baker v. Hayden*, 55 Kan. App. 2d 473, 486, 419 P.3d 31, *rev. granted* 308 Kan. 1593 (2018). Our review has nothing to do with the legal controversy over the judicial records.

We discern three remaining points of contention with Baker's KORA requests to the department. First, the department declined to produce any Professional Standards Unit investigations of the officers for their conduct in entering or remaining on Baker's property on September 2 or September 3 and cited KORA exemptions in K.S.A. 2019 Supp. 45-221(a)(4) for personnel and other records and in K.S.A. 2019 Supp. 45-221(a)(11) for records of agencies involved in administrative adjudications or civil litigation related to "detecting or investigating violations of civil law or administrative rules and regulations" if doing so would "interfere with" future proceedings or reveal confidential sources or undercover operatives. The department did not acknowledge whether it actually had any responsive documents.

Second, the department declined to produce records regarding whether Baker violated any law or obstructed the service of civil process during the September 2 encounter with the officers at his residence. The department cited the exemption in K.S.A. 2019 Supp. 45-221(a)(10) for criminal investigation records. Again, the department's response did not acknowledge whether there were any such documents and couched the declination in terms of "an open criminal investigation."

Third, Baker says the department was two to three weeks late in making responses to some of his requests.

The district court found that the department's assertion of KORA exemptions to keep the requested records secret was appropriate and denied Baker relief on those issues. The district court found that although the department was late in making some responses, Baker was not entitled to relief on that issue, since the department either produced

20

documents or interposed valid statutory grounds for declining to do so. Baker has appealed.

In reviewing the district court's rulings and the record on appeal, we find nothing indicating the department submitted any documents it claimed to be exempt from disclosure under KORA to the district court for in camera review. There are no such documents in the appellate record.

*B. Legal Analysis*

In his petition, Baker named Sheriff Frank Denning in his official capacity as the defendant in the KORA claims and later substituted Calvin Hayden, when he became sheriff. The sheriff's department appears to be a "public agency" within the meaning of KORA and presumably would be the entity liable for any violation. See K.S.A. 2019 Supp. 45-217(f)(1) (defining "public agency"); K.S.A. 2019 Supp. 45-222 (civil remedies); K.S.A. 2019 Supp. 45-223(a) (public agency liable for civil penalty in action brought by attorney general, county attorney, or district attorney). We suppose an official-capacity suit against a county sheriff comports with KORA, especially in the absence of an objection. Any error presumably would be a correctable misjoinder problem. See K.S.A. 2019 Supp. 60-215(c)(3); K.S.A. 2019 Supp. 60-221.

As framed in the appellate record, the KORA issues present questions of law for our review. Baker's requests for documents and the department's responses are in writing, so we may review them just as well as the district court. And those communications then must be evaluated against the requirements outlined in KORA, a matter of statutory interpretation. We, therefore, owe no particular deference to the district court's legal conclusions. See *Cheney v. Poore*, 301 Kan. 120, 125, 339 P.3d 1220 (2014) (interpretation of statute question of law subject to unlimited appellate review); *Thoroughbred Assocs. v. Kansas City Royalty Co.*, 297 Kan. 1193, 1207, 308 P.3d 1238 (2013) (appellate court exercises unlimited review over "interpretation and legal effect of

written instruments"); *Telegram Publishing Co. v. Kansas Dept. of Transportation*, 275 Kan. 779, 784, 69 P.3d 578 (2003) (applying those rules to appellate review of KORA claim).

The Legislature intended KORA as a spotlight on the State and on local governments by generally making their records available for public inspection, thereby cultivating confidence in their operations. K.S.A. 45-216(a); see *Telegram Publishing*, 275 Kan. 779, Syl. ¶ 2. And the Legislature has directed that KORA be "liberally construed and applied" to achieve that public policy objective. K.S.A. 45-216(a); see *Cypress Media, Inc. v. City of Overland Park*, 268 Kan. 407, 416, 997 P.2d 681 (2000). Consistent with that mandate, the appellate courts should narrowly construe the statutory exemptions permitting government agencies to keep documents secret. *Telegram Publishing*, 275 Kan. at 785.

We cannot perform an appropriate review in this case because the documents the department seeks to withhold have never been submitted to the district court for consideration. We fail to see how the district court could have determined the propriety of the claimed exemptions without inspecting the documents, if they exist. See K.S.A. 2019 Supp. 45-222(b) (district court may require production of "records in controversy" for in camera inspection); *Laut v. City of Arnold*, 417 S.W.3d 315, 326 (Mo. App. 2013) (trial court reversed for entering summary judgment keeping internal affairs reports confidential under similar provisions of Missouri open records statute without having reviewed the documents). The sheriff's department has taken the position that it interposed a legally sufficient exemption without confirming or denying the existence of any responsive records. See *Abdur-Rashid v. New York City Police Department*, 31 N.Y.3d 217, 225-26, 100 N.E.3d 799, 76 N.Y.S.3d 460 (2018) (court majority recognizes limited right under New York open records statute for agency to decline to acknowledge existence of certain documents when acknowledgment would itself potentially compromise ongoing criminal investigation). If there are no responsive records and the department is mistaken on this point, the district court may have to address additional

22

KORA considerations. Without the disputed records or a clear understanding no such records exist, we are unable to carry out a meaningful oversight function on appeal. Given the substantial public policies advanced in KORA, we would be remiss in simply affirming the district court when the appellate record doesn't necessarily support its legal conclusions.

This is not a situation in which the findings or conclusions are deficient on their face because some material fact or governing legal rule has not been addressed. Ordinarily, the appellant must bear the burden of that sort of omission on appeal absent a request to the district court for further findings and conclusions. *Fischer v. State*, 296 Kan. 808, Syl. ¶ 9, 295 P.3d 560 (2013). Here, we are left without confidence the district court fashioned appropriate findings and conclusions based on the available evidence. Moreover, the department was obligated to furnish that evidence, since it sought summary judgment, had exclusive control of the disputed documents, and claimed an exemption from disclosure. *Telegram Publishing*, 275 Kan. at 785 (government agency bears burden of proving applicability of KORA exemption).

We, therefore, reverse the district court's entry of summary judgment in favor of Sheriff Hayden on Baker's KORA requests for the disclosure of both the Professional Standards Investigation documents and the documents related to any investigation of Baker for his interaction with the officers who came to his residence on September 2. On remand, the district court should reopen the proceedings, as it sees fit, to permit the department to submit for an in camera review those documents it has declined to make available to Baker. The department, then, must furnish the records to the district court under seal or inform the district court under seal that it never had documents responsive to either or both of the requests. The device (the order and response) should be tailored in a way that doesn't compromise the department's legal claim that it need not even acknowledge the existence of any responsive documents.

23

In light of the department's response, the district court ultimately needs to make new findings and conclusions consistent with this opinion. Since we are remanding a summary judgment, the district court has broad latitude in how it gets from the production order to the new findings and conclusion. The district court should determine what, if any, access Baker may have to the department's response and impose appropriate limitations on his use or disclosure of that information. The district court may, of course, request additional evidence, invite only further briefing or argument, or dispense with more input from the parties before rendering a ruling.

Finally, we are unpersuaded by Baker's abbreviated argument on appeal that the district court erred in denying him relief on his claim the department violated the good-faith requirements of KORA when it took 17 days to respond to some of his requests for documents. We affirm that portion of the district court's decision.

Affirmed in part, reversed in part, and remanded with directions.